**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| **Oscar Robinson** | : | CIVIL ACTION - LAW |
| *Plaintiff,* | : | |
| v. | : | |
| | : | No. 2:22-cv-01439-ER |
| **City of Philadelphia, Police Commissioner** | : | |
| **Danielle Outlaw; Police Officer Eric** | : | |
| **Clark, Police Officer Ryan Redmond,** | : | |
| **Lieutenant Trevor Peszko, Police Officer** | : | JURY TRIAL DEMANDED |
| **Pedro Martin; and Police Officer Robert** | : | |
| **McGrody** | : | |
| *Defendants.* | : | |

## SECOND AMENDED COMPLAINT

**AND NOW**, comes Plaintiff, Oscar Robinson, by and through his undersigned counsel, Falkenbach Law, LLC, and files this Second Amended Complaint consistent with the Order dated August 8, 2022 from the Honorable Eduardo C. Robreno, averring as follows:

## INTRODUCTION

1.      Plaintiff brings this action under 42 U.S.C. § 1983 seeking redress for extraordinary misconduct of the above-captioned Philadelphia Police Officers who used improper and unconstitutional means to subject Plaintiff to unlawful arrest and imprisonment, unlawful search, excessive use of force, retaliation, as well as violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq*, including the Rehabilitation Act ("RA"), 29 U.S.C. §701 *et seq*., as well as state law claims identified hereinbelow.

2.      The actions and conduct of the defendant officers were the result of policies, practices, customs and deliberate indifference on the part of Defendant City of Philadelphia, including failing to take disciplinary actions against excessive use of force, insufficient policies for the Philadelphia Police Department pertaining to use of force, and racism within the Philadelphia Police Department.

1

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights protected by 4th and 14th Amendments to the United States Constitution and pursuant to the ADA, including the RA.

4.    Plaintiff's claims for compensatory and punitive damages are authorized by 18 U.S.C. § 1964 and 42 U.S.C. § 1983.

5.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 23 U.S.C. § 1367(a).

6.    Venue is proper in this district under 28 U.S.C. § 1391(b) as the events giving rise to Plaintiff's claims occurred in this judicial district, and Defendants are located within this district.

## PARTIES

7.    Plaintiff, Oscar Robinson, is an adult individual who is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

8.    Defendant, City of Philadelphia, is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department ("PPD") which employees Defendants Commissioner Danielle Outlaw, Police Officer Eric Clark, Police Officer Ryan Redmond, Police Officer Pedro Martin, Police Officer Robert McGrody, and Lieutenant Trevor Prezko.

9.    Defendant, Police Commissioner Danielle Outlaw ("Commissioner Outlaw") at all relevant times was employed as the Police Commissioner with the City of Philadelphia. Upon information and belief, Commissioner Outlaw is a municipal policymaker and was responsible

for the formation and/or implementation of practices, policies, procedures, discipline and assignment of officers, hiring and firing, as well as day to day operation and overseeing command and control of PPD, including Defendant Officers and the policies and procedures identified herein. The claims being asserted herein against Commissioner Outlaw are in her individual capacity only consistent with the August 8, 2022 Order.

10.    Upon information and belief, Defendant, Police Officer Eric Clark ("PO Clark" or "Defendant Clark") is an adult individual who, at all times relevant hereto was serving in his capacity as a sworn officers of the PPD and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the City of Philadelphia. PO Clark was entrusted to protect the Constitutional rights of those he encountered and at all times relevant hereto, was acting under color of law, and acted in concert with one or more of the individual Defendants in the performance and conduct of his or their actions or acted independently.

11.    Upon information and belief, Defendant, Police Officer Ryan Redmond ("PO Redmond" or "Defendant Redmond") is an adult individual who, at all times relevant hereto was serving in his capacity as a sworn officers of the PPD and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the City of Philadelphia. PO Redmond was entrusted to protect the Constitutional rights of those he encountered and at all times relevant hereto, was acting under color of law, and acted in concert with one or more of the individual Defendants in the performance and conduct of his or their actions or acted independently.

12.    Upon information and belief, Defendant, Police Officer Pedro Martin ("PO Martin" or "Defendant Martin") is an adult individual who, at all times relevant hereto was serving in his capacity as a sworn officers of the PPD and was entrusted with the power to

enforce the laws of the Commonwealth of Pennsylvania and the City of Philadelphia. PO Martin

was entrusted to protect the Constitutional rights of those he encountered and at all times

relevant hereto, was acting under color of law, and acted in concert with one or more of the

individual Defendants in the performance and conduct of his or their actions or acted

independently.

13. Upon information and belief, Defendant, Police Officer Robert McGrody ("PO

McGrody" or "Defendant McGrody") is an adult individual who, at all times relevant hereto was

serving in his capacity as a sworn officers of the PPD and was entrusted with the power to

enforce the laws of the Commonwealth of Pennsylvania and the City of Philadelphia. PO

McGrody was entrusted to protect the Constitutional rights of those he encountered and at all

times relevant hereto, was acting under color of law, and acted in concert with one or more of the

individual Defendants in the performance and conduct of his or their actions or acted

independently.

14. Upon information and belief, Lieutenant Trevor Peszko ("Lieutenant Peszko") is

an adult individual who, at all times relevant hereto was serving in his capacity as a sworn

officers of the PPD and was entrusted with the power to enforce the laws of the Commonwealth

of Pennsylvania and the City of Philadelphia. Lieutenant Peszko was entrusted to protect the

Constitutional rights of those he encountered and at all times relevant hereto, was acting under

color of law, and acted in concert with one or more of the individual Defendants in the

performance and conduct of his or their actions or acted independently. Upon information and

belief, Lieutenant Peszko was responsible for the formation and/or implementation of practices,

policies, procedures, discipline and assignment of officers, hiring and firing, as well as day to

day operation and overseeing command and control of PPD, including Defendant Officers.

4

15.     At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the Plaintiff of his Constitutional and statutory rights.

16.     At all times relevant to this Complaint, all defendants acted under color of law.

17.     The Defendant Officers are being sued in their individual capacities.

## FACTS

### I.    May 21, 2020 Incident

18.     The May 21, 2020 incident is captured by bystander videos, as well as body camera footage of the PPD Police Officers on the scene.

19.     This footage shows numerous Constitutional violations of individuals and improper police techniques.

20.     On May 22, 2020, at approximately 5:30 p.m., Plaintiff arrived at 2929 North Philip Street in Philadelphia, PA 19133 for a block memorial service being held for his best friend, Hector, who had passed away several days before.

21.     Present at the memorial service was Plaintiff's friends and family, including his four (4) month old son and the five (5) year old child of Plaintiff's girlfriend.

22.     Plaintiff's friends and family gathered on May 22, 2020 for a candle light vigil to honor their tragically murdered friend.

23.     Some of the individuals, including Plaintiff, were wearing specially designed t-shirts to honor the deceased.

24.     Specifically, these t-shirts depicted Plaintiff's deceased friend with a halo above his head, clearly indicating that the individuals on the street were gathered for a memorial service.

25.     Less than twenty minutes after Plaintiff's arrival to the memorial service, Police Officers from the Philadelphia Police Department (hereinafter "PPD") arrived, including the PO Clark, PO Redmond and PO Martin.

26.     When PPD arrived on the scene, a car on the block was playing music which belonged to one of Plaintiff's friends.

27.     After the arrival of the PPD police officers, Plaintiff went to turn off the music from the car to allow the officers to be heard.

28.     PO Clark got out of his police cruiser and immediately ran up to Plaintiff who is bent over and puts a gun in his back.

29.     Notably, PO Clark did not even attempt to determine the situation or even properly identify the individual prior to pulling a gun and placing it into the back of Plaintiff, but immediately acted with deadly force.

30.     No verbal commands, warnings, or other lesser methods of force were attempted prior to a gun being shoved into the back of Plaintiff.

31.     Rather, the situation was immediately escalated to use of a deadly firearm without any justification.

32.     PO Clark proceeded to take Plaintiff to the police car with the gun drawn on his back the entire time.

33.     Plaintiff was not resisting arrest and his hand were behind his back this while being escorted to the police car by PO Clark.

34.     At the police vehicle, PO Clark patted Plaintiff down, handcuffed him, took his cellphone, and placed him into the police car.

35.     PO Martin begins searching the vehicle that Plaintiff was located in without consent, probable cause, or a warrant.

36.     PO Martin subsequently requests to start searching other vehicles at the vigil, as he did not locate anything illegal within the vehicle that Plaintiff was located in.

37.     During this time, PO Redmond enters a home near the memorial service with gun drawn.

38.     While in the home, PO Redmond points his gun at a small child which appears approximately 8 years old.

39.     It is later determined that the home that PO Redmond entered was not the house "were a lot of criminal activity" takes place, but rather the wrong home.

40.     No warrant was ever obtained nor was there probable cause to search this home.

41.     Footage of the incident captures PO Clark initially stating that he saw a gun when he got on the scene, but then later identifies that he did not actually see a gun when he was one the scene – but believes there to be a gun in one of the homes on the scene.

42.     Plaintiff was left in the police car for over an hour without air conditioning or the windows down even after the determination was made that there were no weapons in the vehicle and no probable cause for his arrest.

43.     The temperature on this day was a high of 72 and a low at night of 61.

44.     Plaintiff can be heard in the police vehicle stating numerous times stating "I just had a gun in my back how do you think I feel? "and showing signs of clear distress.

45.     PO Anthony Agudo of the PPD is heard calling this incident a cluster fuck.

46.     A bystander who was working construction nearby who was upset by the situation, identifies that there was no reason for this to occur, that everyone here is in pain and has been in tears.

47.     Officer James Dorsey of the PPD is heard cursing at the bystander, stating "you ain't about shit" to him multiple times and "keep fucking with me."

48.     PO Martin could not obtain a search warrant for the searching of a home on the block. He is continually heard stating that he needs to call others and to see "if we can do some convincing" regarding getting a search warrant despite being told that a "warrant wouldn't stick."

49.     PO Martin is heard lying to attempt to obtain a search warrant to multiple individuals on the phone – stating that Plaintiff isn't allowed to have a gun and they saw him with a gun, that the whole group is known felons.

50.     Plaintiff has never been convicted of a crime and was never arrested prior to the May 21, 2020 incident.

51.     Plaintiff has nothing which disallows him ownership of a gun nor did Plaintiff have a gun during the May 21, 2020 incident.

52.     Multiple PO's are heard stating they should go into the home even without a warrant and trying to find ways to get into the home despite knowing that a "warrant would not stick."

53.     No warrant was ever obtained associated with searching of any home or vehicle.

54.     Despite learning that a warrant was not going to be obtained and nothing was located in the vehicle, Plaintiff continues to be left in the police vehicle.

55.     PO Martin is heard telling Plaintiff's girlfriend that Plaintiff will be detained for as long as he needs to be detained – even after learning he will not be able to obtain a warrant nor finding anything which would permit Plaintiff's arrest or detention.

56.     When Plaintiff is finally released, he requests his cellphone, to which Officer Tyler Smith of the PPD states that he threw it down the sewer.

57.     During his release, Plaintiff states and makes it clear that he doesn't want PO Clark touching him after the having PO Clark place a gun in his back.

58.     PO Redmond is heard mocking Plaintiff, stating "bro, get some bigger shorts," as Plaintiff's shorts were sagging.

59.     PO Tyler Smith of the PPD is heard telling Plaintiff they will see him at the next vigil.

60.     PO Redmond is heard mocking bystanders, tell them to "use your head, common sense here," "good one," and telling people to "shut up."

61.     No reports were filled out by any PO of the PPD associated with the May 21, 2020 incident.

62.     No one was disciplined by the PPD associated with the May 21, 2020 incident.

63.     Plaintiff obtained contusions around his wrists associated with the handcuffing of this false arrest.

**II.     Between the May 21, 2020 Incident and July 28, 2020 Incident**

64.     On or about June 9, 2020, a PPD police officer arrived at the home of Plaintiff.

65.     The PPD police officer placed a pink slip onto Plaintiff's doorstep, called him a "mother fucker," and left.

66.     Upon review of the pink slip, it indicated to contact Lieutenant Trevor Peszko of the PPD.

67.     Plaintiff, through his then retained counsel, contacted Lieutenant Peszko from the PPD.

68.     A PPD internal affairs interview with Lieutenant Peszko was set up and subsequently held with Plaintiff on June 30, 2020 regarding the May 22, 2020 incident.

69.     During this interview, Plaintiff identified the misconduct of PO Clark, and his partner, PO Martin, and showed the video evidence obtained of the May 22, 2020 incident.

70.     Plaintiff provided a formal statement complaining of the conduct of these police officers.

71.     Upon information and belief, Lieutenant Peszko failed to take any actions against the PO Clark, PO Redmond, or PO Martin associated with the May 22, 2020 incident despite clear video evidence of severe misconduct, resulting in the subsequent conduct identified *infra* by the same Police Officers.

72.     After completing the formal statement complaint of the conduct of the PO Clark, PO Redmond, and PO Martin, Plaintiff began witnessing cop cars from their associated district drive past his home, which was located in a different police district, increasing the mental strife being caused by Plaintiff after the May 22, 2020 incident.

73.     After the May 22, 2020 incident, Plaintiff began to have significant mental health issues.

74.     On or about July 10, 2020, Plaintiff went to see a psychiatrist for his mental health issues.

75.     At this time, the psychiatrist diagnosed Plaintiff with post-traumatic stress disorder ("PTSD") associated with the May 22, 2020 incident, including, *inter alia*, intrusive memories of the incident, unpleasant dreams, poor sleep, avoidance of the location of the incident, startle response, feeling he will not live long, paranoia of being followed, fear of the police, and low mood.

### III.    <u>July 28, 2020 Incident</u>

76.    Like the May 21, 2020 incident, the July 28, 2020 incident is heavily captured by footage of both bystanders and police body cameras.

77.    Similarly, the July 28, 2020 depicts numerous Constitutional violations, improper police techniques, and violations of the PPD use of force policy – as discussed *infra.*

78.    On July 28, 2020, PO Clark and his partner, PO Martin, appeared in a police cruiser out front of Plaintiff's house while Plaintiff and his brother are on the porch.

79.    Defendants PO Clark and PO Martin asked if anyone called the cops.

80.    Plaintiff responded that no one had called the cops.

81.    Despite asking if anyone had called the cops, PO Clark and PO Martin proceeded to come onto the porch and state that they have a warrant for Plaintiff's arrest.

82.    PO Clark and PO Martin began tugging and grabbing Plaintiff.

83.    Plaintiff realizing these are the same police officers from the May 22, 2020 incident – together with the inconsistent prior questioning of whether someone called the cops and his PTSD - requested to see a copy of the warrant on multiple occasions.

84.    Plaintiff specifically indicated that he would go with them if they showed him the warrant.

85.    PO Clark and PO Martin knew or should have reasonably known that the May 22, 2020 incident where PO Clark placed a gun in Plaintiff's back without cause would have created psychological issues.

86.    PO Clark and PO Martin refused to show a copy of the warrant to Plaintiff despite this and knowledge and personal involvement in the May 22, 2020 incident.

87.     Plaintiff reasonably believed based upon the above that PO Clark and PO Martin were retaliating against him for his prior complaint of excessive force against them and that they did not have an actual warrant.

88.     Instead of providing proof of the warrant, PO Clark and PO Martin requested additional police officers to the scene.

89.     PO Redmond ran up the steps of onto Plaintiff's porch, instantly forcefully pulled him out of his seat, and placed him into a chokehold.

90.     Notably, PO Redmond did not even attempt to determine the situation prior to running up the steps and immediately engaging in improper hand combat.

91.     PO Redmond proceeded to kick Plaintiff's girlfriend in the stomach who had given birth merely months prior.

92.     PO McGrody ran up the steps to the porch put his hand around the neck of Plaintiff while Plaintiff was in a chokehold from PO Redmond.

93.     An unidentified PPD police officer is shown taking out a ASP/Baton.

94.     PO McGrody increased the risk of injury to Plaintiff's neck by engaging in unnecessary improper hand combat of choking while Plaintiff was already in a chokehold by PO Redmond.

95.     Plaintiff's brother was videotaping the incident of Plaintiff's arrest on the porch – a safe distance from Plaintiff and the other police officers – not obstructing any arrest.

96.     PO Connor Dooley ran up the steps onto Plaintiff's porch and knocked the phone out of Plaintiff's brother's hand.

97.     PO McGrody holds Plaintiff's neck down from behind, while PO Clark, PO Martin, and PO Redmond hold Plaintiff's stomach and ribs against the railing of the porch and handcuff him.

98.     Plaintiff is heard numerous times identifying he can't breathe while being pressed against the railing and that the officers were causing injuries to his stomach and neck.

99.     PO McGrody is heard mocking the Plaintiff and escalating the situation during this time, saying to "tough him up."

100.    PO Martin escorts the Plaintiff handcuff down the stairs from the back.

101.    PO McGrody is seen holding onto the belt loop of handcuffed Plaintiff from the front.

102.    PO McGrody pulls the belt loop of Plaintiff, causing him to fall down the concrete steps of his home.

103.    PO McGrody then proceeds to drag Plaintiff down the remainder of the concrete steps.

104.    Another PPD Police Officer is heard escalating the situation and yelling at bystanders, including calling one a "fucking pussy."

105.    PO Redmond is heard saying "hey Oscar, you're caught," while Oscar is being placed into the police vehicle.

106.    The counsel on behalf of the City of Philadelphia made representations during the hearing of the Motion to Dismiss on August 3, 2022 that only PO Redmond was disciplined associated with the July 28, 2020 incident.[1]

---

[1] Plaintiff's counsel has not had the opportunity to confirm the accuracy of such representation.

107.    Notably, open records for payroll associated with the Philadelphia Police Department identify that PO Redmond had substantial overtime paid out to him in all quarters of the 2020 year.

108.    Therefore, it is believed that PO Redmond did not have any meaningful discipline to dissuade his clear misconduct, such as a suspension or termination, associated with his conduct during the July 28, 2020 incident.

109.    The May 22, 2020 incident took place in the 24-25th Philadelphia Police District with police officers associated with this district, including the PO Clark, PO Martin, PO Redmond, and PO McGrody.

110.    Despite the July 28, 2020 incident taking place at the 15th Philadelphia Police District, the same officers from the 24-25th Philadelphia Police Department initiated and were present.

111.    Plaintiff was then placed into a PPD vehicle.

112.    While in the police vehicle, Plaintiff requested medical attention for his injuries.

113.    Plaintiff was taken the emergency room at Temple University Hospital.

114.    During this time, Plaintiff was put into a hospital gown while present with PO Clark and PO Martin.

115.    The PO Clark and PO Martin videotaped Plaintiff in his hospital gown and told him that they would be viewing the footage later and laughing at him.

116.    While at Temple University Hospital, Plaintiff received multiple x-rays of the left ankle, left knee, cervical spine, and lumbar spine.

117.    These hospital records also denote abrasions to the back associated with the July 28, 2020 incident.

118.    Plaintiff was never convicted of any crime associated with either the May 22, 2020 or July 28, 2020 incidents.

119.    Plaintiff further had no prior criminal record before the May 22, 2020 incident.

**IV.    After the Filing of the Complaint in Federal Court**

120.    After the filing of the initial Complaint in this matter, Plaintiff began being harassed by police officers of the PPD again.

121.    The incident is captured by his porch camera.

122.    On June 28, 2022, at 1:19 a.m. police officers of the PPD show up at Plaintiff's residence and began pounding on his door.

123.    Notably, Plaintiff resides with his girlfriend and two (2) minor children under the age of eight.

124.    The pounding awakens Plaintiff and terrifies him.

125.    The PPD police officers subsequently leave.

126.    There was no reason for the PPD police officers to be at Plaintiff's home in the middle of the night.

**V.    Additional Information**

127.    The police officers identified above are part of the 24th District and 25th District of the Philadelphia Police Department.

128.    PPD has use of force policies, a copy of the most recent use of force policies are attached hereto as **Exhibit A**.

129.    Relevant portions of the use of moderate/limited force policy states as follows:

> **POLICY**
>
> A.    …Only the amount of force necessary to protect life or to effect an arrest should be used by an officer. Excessive force will

not be tolerated. Officers should exercise all safe and reasonable means of control and containment, using only the minimal amount of force necessary to overcome restraint.

C.       Subjects may be physically and mentally incapable of responding to police commands dur to a variety of circumstances including…medical conditions…Officers should be mindful of this when making use of force decisions.

**USE OF FORCE**

GOAL: ***To always attempt to de-escalate and use sound tactics in any situation where force may become necessary.*** In the event force becomes unavoidable, use only the minimal amount of force necessary to overcome an immediate threat or to effectuate an arrest… **[O]nce a threat has been overcome, or a subject is securely in custody, it is an officer's responsibility to de-escalate…**

130.    This policy further identifies that control holds and OC Spray are only authorized for individuals is merely non-compliant and resisting an officer's commands.

131.    The policy states that an ASP/Baton is authorized when an offender is physically aggressive or assaultive and there is immediate likelihood that they may injure themselves or others.

132.    The policy goes on to instruct that deadly force is authorized when the officer has an objectively reasonably belief that they must protect themselves or another person from the immediate threat of death or serious bodily injury.

133.    The use of force policy specifically prohibits neck restraints, requires a use of force report to be created for "any instance where a firearm is intentionally pointed at an individual," requires an evaluation of the situation, and when feasible, a verbal warning to the individual.

134.    The policy officers violated the use of force policy the following ways associated with the May 21, 2020 incident without discipline:

      i.   PO Clark pointed a gun in the back of Plaintiff;

      ii.   No use of force report was filed for pointing a gun in the back of Plaintiff;

      iii.   Escalation of the situation by using mocking and cursing to bystanders and Plaintiffs, specifically the follows:

         a.   PO Redmond mocking Plaintiff, stating "bro, get some bigger shorts," as Plaintiff's shorts were sagging.

         b.   PO Redmond mocking bystanders, telling them to "use your head, common sense here."

         c.   PO Redmond mocking bystanders saying "good one."

         d.   PO Redmond telling bystanders to "shut up."

         e.   Officer James Dorsey of the PPD cursing at a bystander, stating "you ain't about shit" to him multiple times.

         f.   Officer James Dorsey of the PPD cursing at a bystander, stating "keep fucking with me."

         g.   PO Tyler Smith telling Plaintiff they will see him at the next vigil.

         h.   PO Tyler Smith pretending that he threw Plaintiff's phone in the sewer.

      iv.   Failure of PO Clark to evaluate the situation.

      v.   Failure of PO Clark to provide any verbal warning prior to using deadly force.

      vi.   PO Redmond pointed a gun at an approximately 8-year-old child;

      vii.   Failure of PO Redmond to file a use of force report associated with pointing a gun at an approximately 8-year-old child.

135.    The PO Martin and PO Redmond also engaged in two (2) unconstitutional searches without a warrant or probable cause during the May 21, 2020: the vehicle Plaintiff was found in and a home located near the vigil, as well as providing false information in an attempt to obtain a search warrant.

136.    Again, no police officers were disciplined associated with the May 21, 2020, despite the sixteen (16) clear instances of misconduct by the 24th and 25th District PPD Police Officers.

137.    The police officer who dropped off the pink slip at the door of Plaintiff after the May 21, 2020 incident is also heard escalating the situation by calling Plaintiff a "mother fucker."

138.     The police officers violated the use of force policy the following ways associated

with the July 28, 2020 incident:

    i.     PO Redmond placed Plaintiff in a chokehold;

    ii.    PO Redmond failed to evaluate situation prior to engaging in force;

    iii.   PO Redmond failed to provide any verbal commands prior to engaging in force;

    iv.   PO Redmond assaulted a female bystander by kicking her in the stomach;

    v.    PO Connor Dooley assaulted a male bystander who was videotaping the incident, knocking his cellphone out of his hand to disallow him to continue taping;

    vi.   PO McGrody placed his hand around Plaintiff's neck while he was placed in a chokehold;

    vii.  PO McGrody dragged Plaintiff, while he was handcuffed, down concrete steps;

    viii.  PO McGrody placed his hand on the back of Plaintiff's neck, holding him down further, while other officers held Plaintiff up against the railing;

    ix.   PO Redmond, PO Clark, and PO Martin all jointly utilize their body weight to pin Plaintiff up against a railing restricting Plaintiff's ability to breath;

    x.    Escalation of the situation by using mocking and cursing to bystanders and Plaintiffs, specifically the follows:

        i.    A PPD Police Officer calling a bystander a "fucking pussy";

        ii.   PO McGrody telling PO Redmond, PO Clark, and PO Martin to "tough him up" while they are pinning Plaintiff down on the railing;

        iii.  PO Redmond telling Plaintiff "hey Oscar, you're caught" while he is being placed into the police vehicle;

139.     As such, there are twelve (12) clear instances of misconduct by the 24th and 25th

District Police Officers associated with the July 28, 2020 incident;

140.     The only officer who was provided any discipline associated with the July 28,

2020 incident was PO Redmond according to statements provided by counsel for the City of

Philadelphia at the August 2, 2020 hearing.

141.     Again, PO Redmond was not disciplined in any meaningful way, as public

records establish that he had substantial overtime with the PPD in all quarters of the 2020 year.

142.     Plaintiff contends the twenty-nine (29) incidents of clear misconduct by the 24th and 25th District Police Officers should be enough to establish a pattern and practice for a *Monell* claim.

143.     Outside evidence also confirms a failure to train and failure to discipline by the PPD for a *Monell* claim.

144.     The American Civil Liberties Union of Pennsylvania ("ACLU") conducted an extensive investigation regarding the Philadelphia Police Department in response to Black Lives Matter protests in May and June 2020 – the same time as the incidents in question.[2]

145.     The investigation by the ACLU was not just limited to incidents of protests, but discussed the inadequate long-standing practices and policies of the PPD.

146.     The determination of the investigation from the ACLU revealed that the PPD's Policies on the Use of Force do not comply with human rights standards.

147.     The ACLU article also discusses the failure of PPD officers to contemplate prior to using force the balance of the harm that will be caused by the use of force with the legitimate interest that is being protected, noting that multiple protestors were pepper sprayed while handcuffed in PPD custody and without providing any verbal warnings or attempts to de-escalate.

148.     The ACLU investigation further concluded that the City of Philadelphia's accountability procedures for the PPD are woefully inadequate and out of line with human rights

---

[2] *See* ACLU of Pennsylvania and Drexel University, *Letter of Allegation regarding the Excessive Use of Force and Discrimination by the Philadelphia Police Department in response to Black Lives Matter Protests in May and June 2020*, https://aclupa.org/sites/default/files/field_documents/2020.11.23.un_submission_on_police_violence_in_philadelphia_final.pdf

standards, specifically that the City of Philadelphia provides little to no oversight of and accountability for police violence.

149.    The ACLU also discussed the long history of overt racism amongst PPD officers against African Americans, such as Plaintiff. This includes information that as recent as 2019 racist and/or violent Facebook posts were published by over 300 active duty PPD officers, including command staff.

150.    The investigation of the ACLU further determined that civilian complaints against police are investigated and adjudicated by the PPD itself and only about 19% of the civilian complaints are sustained by Internal Affairs after an investigation. However, even when a complaint is sustained, it does not mean that an officer will receive any disciplinary action greater than a reprimand and a note in a personal file rather than being sent to the Police Board of Inquiry for a hearing.

151.    An article, *Fired, Then Rehired*, Phila. Inquirer, Sept. 12, 2019, establishes that the PPD has a history and practice of reversing and/or reducing more than two-thirds of department-imposed discipline. A copy of this article is attached hereto as **Exhibit B**.

152.    This is consistent with the article, *With No Independent Oversight, Only Cops Investigate Cops in Philly*, Phia. NBC, Aug. 25, 2020, which identifies that the PPD provides oversight to themselves. A copy of this article is attached hereto as **Exhibit C**.

153.    The PPD has also provided information on opendataphilly.org – as part of the PPD's accountability processes, including complaints against police dataset, findings, and status of investigation for a period of five (5) years.

154.    The opendataphilly.org establishes that the PPD 24th and 25th District has over 994 complaints against them in the last five years which were investigated.

155.    Of these 994 investigated complaints against the PPD 24th and 25th District, only 38 ended in "guilty findings" and 71 ended in "training/counseling."

156.    Of the 994 investigated complaints against the PPD 24th and 25th District in the past five (5) years there were no discipline for the 140 complaints of physical abuse, the 80 complaints of verbal abuse, or the 21 complaints of civil right violations.

157.    Upon information and belief, these complaints were inadequately investigated, if investigated at all, and were provided inadequate discipline which lead to a culture in which police officers knew there would be no real professional consequences for their actions.

158.    Similar to this historical improper discipline established regarding PPD, upon information and belief, Lieutenant Trezsko failed to provide any disciplinary action that would deter the Defendant Officers to continue to engage in improper conduct, which is established by the July 28, 2020 incident which occurred less than a month after the investigation of the May 22, 2020 incident.

159.    Based upon the investigation completed by the ACLU, it is reasonably believed that Commissioner Outlaw failed to establish proper policies and procedures to provide proper oversight and accountability for use of force by police officers and racism, which lead to the multiple instances of excessive use of force against Plaintiff, Oscar Robinson, an African American, unlawful arrest, and the retaliation against him.

160.    On October 25, 2021, the PPD, along with the Office of Policy and Strategic Initiatives for Criminal Justice and Public Safety and the Department of Behavioral Health and Intellectual disAbility Services made a statement identifying that "Mr. Wallace Jr.'s death, along

21

with last year's protests, underscored the urgency of many important reforms such as mental health training." [3]

161.    PPD clearly acknowledged its own lack of mental health training as an issue at the relevant times therein, which includes the timeframe associated with the actions taken against Plaintiff.

162.    Specifically, the shooting of Walter Wallace, Jr.. an individual with mental health issues, took place in summer of 2020 when he was wielding a knife and the PPD responding officers fired at least 14 shots at him when he did not follow orders.[4]

163.    PO Clark, PO Redmond, PO Martin, and PO McGrody collectively hereinafter referred to as "Defendant Officers") disregarded proper police practices, had insufficient training on arrests dealing with mental health, and/or purposefully acted with an intent to discriminate against Plaintiff and these actions led the improper conduct in this case.

164.    The excessive use of force, unlawful arrest, search, detention, harassment, retaliation, and disregard of reasonable requests for accommodations of known or reasonably foreseeable disabilities in this case were the direct result of the defendants' pattern, practice and custom of racial profiling and extreme use of force without utilizing the proper use of force continuum, proper warnings, or attempts to utilize less lethal means of force.

165.    Defendant Officers acted willfully, deliberately, maliciously or with reckless disregard of the Plaintiff's constitutional and statutory rights.

166.    As a direct and proximate result of all defendants, Plaintiff suffered and continues to suffer physical and psychological harms, pain and suffering, some or all of which may be permanent, as well as financial losses, including loss wages.

---

[3] https://www.phila.gov/2021-10-25-improving-behavioral-health-resources-and-police-response/
[4] phillyvoice.com/police-mental-health-emergency-response-walter-wallace-philadephia/

167.    Defendants engaged in the aforesaid conduct for the purpose of violating the Plaintiff's constitutional rights by subjecting him to the unreasonable use of force, unlawful arrest, search, detention, harassment, retaliation, and discrimination.

168.    Defendant City of Philadelphia has failed to properly train, supervise, and discipline the Defendant Officers and other officers in the PPD in cases involving violations of rights of civilians, including cases of racial profiling, excessive use of force, improper searches, seizures, arrests, harassment, and retaliation for complaints, thereby causing the violations of this case.

169.    The above-described actions of all the defendants caused the violations of Plaintiff's rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, ADA and RA.

## CAUSES OF ACTION

### COUNT I
### Violation of 42 U.S.C. § 1983
### Excessive Use of Force
### Plaintiff v. Defendant Officers

170.    Plaintiff incorporates by reference each allegation stated in the preceding paragraphs.

171.    Plaintiff was subject to a seizure within the meaning of the Fourth Amendment through application force.

172.    The applicable of force against the Plaintiff was unreasonable under the circumstances and unconstitutionally excessive.

173.    The Fourth Amendment to the United State Constitution protects persons from being subjected to excessive force while being arrested even if the arrest is otherwise proper.

174.    Defendant Officers used excessive force against Plaintiff in that there was no need for the application of any force and the fact that the amount of force used by the Defendant Officers exceeded the amount of force which a reasonable officer would have used under similar circumstances and Defendant Officers knew that their conduct violated a clearly established law.

175.    Lethal force or use of a deadly weapon of any kind was not required nor should it have been employed.

176.    The use of choke holds and other improper and dangerous physical combat should not have been employed.

177.    Plaintiff did not present a threat to the Defendant Officers or any other person or property during the relevant times identified herein.

178.    The use of force was not reasonable by the Defendant Officers under the Constitution where, as here, there was no need for any force especially the use of a deadly weapon.

179.    The nature and degree of excessive force utilized against the Defendant Officers was outrageous, reprehensible, malicious, vicious, intentional and malevolent and clearly warrants an award of punitive and compensatory damages.

180.    As a result of the excessive force against Plaintiff in violation of his Fourth Amendment rights, the Plaintiff suffered damages as stated herein.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with

attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive

damages, and any other damages as deemed appropriate by the Court.

**COUNT II**
**Violation of 42 U.S.C. § 1983**
**Fourth Amendment – Unlawful Seizure/Substantive Due Process**
**Plaintiff v. Defendant Officers**

181.    Plaintiff incorporates by reference each allegation stated in the preceding

paragraphs.

182.    At all relevant times, Plaintiff possessed a liberty interest in his bodily integrity

and was entitled to equal protection under the law, rights which were and are protected by the

Fourth and Fourteenth Amendments to the United State Constitution.

183.    In committing the acts complained of herein, Defendant Officers, while acting

under color of state law, neglected their duties to the public in general and Plaintiff specifically,

acted in concert and/or coordination to conspire to deprive Plaintiffs of their constitutional rights,

discriminated against Plaintiff because he is African American, unlawfully and unreasonably

seized Plaintiff without cause, depriving Plaintiff of those rights and privileges afforded by the

Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

184.    Specifically, Defendant Officers effectuated Plaintiff's arrest without warrant or

probable cause.

185.    At all relevant times Defendant Officers acted with malice, willful disregard

and/or reckless indifference to Plaintiff and under color of state law.

186.    The actions of the Defendant Officers under color of state law, as more fully

described hereinabove, deprived Plaintiff of his liberty and bodily integrity and equal protection

of the law in violation of 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the

Constitution of the United States.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages, and any other damages as deemed appropriate by the Court.

### COUNT III
### Violation of 42 U.S.C. § 1983
### First Amendment Retaliation
### Plaintiff v. Defendant Officers

187.    Plaintiff incorporates by reference each allegation stated in the preceding paragraphs.

188.    At all relevant times, Plaintiff possess a liberty interest in his freedom of speech and was entitled to equal protection under the law, rights which were and are protected by the First and Fourteenth Amendment to the United State Constitution.

189.    Plaintiff exercised his First Amendment rights by filing a complaint against the Defendant Officers and indicating his intent to sue for the May 22, 2020 incident.

190.    As a result of this complaint and intent to sue, Defendant Officers continually harassed Plaintiff by driving past his house to intimidate him, engaged additional excessive use of force against him, ridiculed and videotaped him while he was hospitalized for the excessive use of force utilized against him, and denied him reasonable requests for accommodations to see an alleged warrant.

191.    These actions were taken by the Defendant Officers to deter Plaintiff from exercising his First Amendment rights.

192.     In committing the acts complained of herein, Defendant Officers, while acting under color of state law, neglected their duties to the general public and Plaintiff specifically, acted in concert and/or coordination to conspire to deprive Plaintiff of his constitutional rights, discriminated against Plaintiff because he is African American, unlawfully and unreasonably seized, harassed, and ridiculed Plaintiff for exercised his right to free speech, depriving Plaintiff of those rights and privileges provided by the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

193.     The actions of the Defendant Officers under the color of state law, as more fully described hereinabove, deprived Plaintiff of his freedom of speech and equal protection of the law in violation of 42 U.S.C. § 1983, the First and Fourteenth Amendments to the Constitution of the United States.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages, and any other damages as deemed appropriate by the Court.

**COUNT IV**
**Violation of 42 U.S.C. § 1983**
**Fourth and Fourteenth Amendments - False Imprisonment/Arrest**
**Plaintiff v. Defendant Officers**

194.     Plaintiff incorporates by reference each allegation stated in the preceding paragraphs.

195.     The Fourteenth Amendment provide protections against deprivations of liberty without due process of law.

27

196.     Plaintiff avers that the conduct of the Defendant Officers violated his civil rights under 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the United State Constitution by reason of being detained and arrested without probable cause.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages, and any other damages as deemed appropriate by the Court.

**COUNT V**
**Violations of 42 U.S.C. § 12102, *et seq*, including 29 U.S.C. § 701**
**Americans with Disabilities Act and Rehabilitation Act**
**Plaintiff v. City of Philadelphia**

197.     Plaintiff incorporates by reference each allegation stated in the preceding paragraphs.

198.     Title II of the ADA prohibits programs, activities, and services of public entities from discriminating against any "qualified individual with a disability."

199.     Defendant City of Philadelphia was, at all times relevant to this action, and currently is a "public entity" within the meaning of Title II of the ADA and RA.

200.     Defendant City of Philadelphia provides "services, programs, and activities" including police services within the City of Pennsylvania.

201.     Defendant City of Philadelphia is an organization that receives federal financial assistance, as such RA is applicable to the City of Philadelphia.

202.     Pursuant to his diagnosis of PTSD, Plaintiff was a qualified individual with a disability under the ADA and RA.

203.    If not for his PTSD, Plaintiff would not have been fearful of the Defendant Officers which risked his life by unnecessarily placing a gun in his back and would have been able to comply without fear to their commands.

204.    Defendants knew or reasonably should have known that Plaintiff would have suffered from mental illness following the May 22, 2020 incident whereas Defendant Officers witnessed and/or participated in holding Plaintiff at gun point without probable cause.

205.    Plaintiff was denied benefits and/or discriminated against by public entity Defendant City of Philadelphia.

206.    Defendant Officers wrongfully seized and/or arrested Plaintiff and subjected him to excessive use of force.

207.    Defendant Officers knew or reasonably should have known that Plaintiff suffered from mental illness associated with the May 22, 2020 incident and ignored clear needs associated with such mental illness.

208.    While attempting to seize and seizing Plaintiff, Defendants failed to reasonably accommodate Plaintiff's mental illness.

209.    Many less restrictive courses of action were available to Defendant Officers, but they knowingly ignored these options in violation of Federal and Pennsylvania law.

210.    Defendant Officers should have reasonably accommodated Plaintiff's disability by showing him the alleged warrant or having police officers uninvolved in the May 22, 2020 incident effectuate the warrant.

211.    Instead, Defendant Officers chose to use additional excessive force against Plaintiff.

212.    Upon information and belief, Defendant City of Philadelphia and/or Commissioner Outlaw failed to have written policies and/or to provide training to their police officers regarding the ADA and RA.

213.    Defendant City of Philadelphia and/or Commissioner Outlaws's failure to implement written policies and to provide training to the individual Defendant Officers caused Plaintiff's harm through the violation of his rights.

214.    If Defendant Officers had sufficient policies and/or training in place at the time of the July 28, 2020 incident, they would have been able to provide appropriate means to effectuate any alleged warrant without engaging in excessive use of force.

215.    That risk of an ADA violation in such circumstances was patently obvious given the history and lack of training in dealing with mentally ill individuals, including the use of force on such individuals.

216.    The Defendant Officers rather increased the likelihood of issues and requirement of force by providing conflicting reasons for their presence at Plaintiff's house when they knew or should have known that he was already fearful of them based upon the May 22, 2020 incident.

217.    Rather, the Defendant Officers utilized Plaintiff's mental health issues to deny him a proper and lawful arrest without use of excessive force.

218.    As a result of the City of Philadelphia's violations of Plaintiff's rights under the ADA and RA, Defendant suffered substantial injuries and/or damages as described herein.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with

attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive

damages, and any other damages as deemed appropriate by the Court.

**COUNT VI**
**42 U.S.C. § 1983**
**Municipal Liability**
**Plaintiff v. City of Philadelphia, Police Commissioner Danielle Outlaw, Lieutenant Peszko,**

219.    Plaintiff incorporates by reference each allegation stated in the preceding

paragraphs.

220.    Defendant City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant

Peszko acted with malice, willful disregard and/or reckless indifference to Plaintiff by permitting

a custom, practice and/or procedure to exist in which the City of Philadelphia police officers

acted to disregard Plaintiff's personal and Constitutional liberty interests rather than providing

orderly and appropriate police interaction.

221.    Defendant City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant

Peszko either failed to develop policies and proper disciplinary actions or developed and

maintained policies or customs exhibiting deliberate indifference to the Constitutional rights of

citizens in Philadelphia, which caused the aforesaid violation of Plaintiff's Constitutional rights.

222.    As previously identified, at all times relevant to this matter, PPD lacked oversight

for police violence, failed to appropriately discipline police officers associated with complaints,

provided inadequate policies on use of force, and had a custom of engaging in racial profiling

against African Americans, including Plaintiff.

223.    Furthermore, evidence establishes a history of numerous civilian complaints filed

against the 24th/25th Philadelphia Police District for claims similar to those in nature in this

matter.

224.     It was the policy and/or custom of City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko to inadequately and improperly investigate citizen complaints of police misconduct, especially as it relates to Defendant Officers, and acts of misconduct were instead tolerated and/or justified by Defendant City of Philadelphia and Commissioner Outlaw.

225.     It was the policy and/or custom of City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko to inadequately screen during the hiring process and to inadequately train and supervise its police officers, especially as it relates to Defendant Officers, thereby failing to adequately discourage further Constitutional violations on the part of its police force in general and Defendant Officers in particular.

226.     City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko did not require or demand appropriate in-service training or re-training of officers who were known to have engaged in police misconduct or who were known to encourage or tolerate the same, especially Defendant Officers.

227.     City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko also did not adopt needed policies, which should have been intended and calculated to avoid the Constitutional violations referred to herein.

228.     It was the policy and/or custom of City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko to allow and even promote unlawful activities carried out by Defendant Officers including, but not limited to, excessive force and other Constitutional violations described herein.

229.     Defendant City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko knew that police officers of the PPD would confront situations requiring determination of force and issues with individuals having mental health problems, that the PPD had a history of

police officer mishandling, and that such mishandling will frequently cause deprivation of constitutional rights, but they did nothing to correct the mishandling by PPD police officers.

230.    Rather, City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko continued official tolerance of repeated misconduct facilitating similar unlawful actions in the future, including the actions against Plaintiff, Oscar Robinson.

231.    As a result of the above described policies and customs and failure to adopt necessary and appropriate policies, police officers of the City of Philadelphia and/or Commissioner Outlaw and/or Lieutenant Peszko, including Defendant Officers, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated and even encouraged.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages, and any other damages as deemed appropriate by the Court.

**Count VII**
**42 U.S.C. § 1983**
**Supervisory Liability**
**Plaintiff v. Lieutenant Peszko**

232.    Plaintiff incorporates by reference each allegation stated in the preceding paragraphs.

233.    Defendants Lieutenant Peszko acted in their supervisory capacity under the circumstances, and at a time, when one or more Defendant Officers violated the Plaintiff's rights as set forth herein.

234.    At all times materials to the claims made herein, Lieutenant Peszko occupied policymaking and supervisory positions relative to the PPD and subordinate members of said department, including Defendant Officers.

235.    Lieutenant Peszko both had decision making authority with regarding to the operational conduct of the Defendant Officers. Each possesses the authority to measure the conduct and decisions of police subordinates, including Defendant Officers.  Each has disciplinary authority over police subordinates, including Defendant Officers.  Each played a role in fashioning and implementing Department policies, practices, procedures and customs and often did so in consultation with each other.  Each is a person whose actions and conduct may be fairly said to represent official municipal policy and/or custom.

236.    Lieutenant Peszko deliberately ignored the pattern and history of Constitutional abuses perpetrated by Defendant Officers, deliberately ignored citizen complaints regarding Defendant Officers' Unconstitutional conduct, deliberately to refused to discipline, counsel or train/re-train Defendant Officers when it was clear that discipline, counsel or training/re-training was clearly necessary.

237.    The lacking and/or unenforced practices, policies and procedures which Lieutenant Peszko were required, at a minimum, to promulgate, implement, monitor, enforce and, if necessary modify, include, inter alia, a heightened supervisory sensitivity and vigilance for uncovering and eradicating Constitutional rights violations, procedures whereby citizens who had suffered Constitutional rights violations are encouraged to access a simple, non-retaliatory and responsive procedure to register their complaints and receive prompt objective responses, procedures cataloging complaints and their outcomes, creation of  and real enforcement of appropriate disciplinary procedures when complaints of Constitutional rights violations were

founded and adequate training and re-training of officers, including Defendant Officers, when needed.

238.    The actions and/or inactions of Lieutenant Peszko, as more fully described hereinabove, directly involved in this matter helped create the injuries and damages suffered by Plaintiff stated herein.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages, and any other damages as deemed appropriate by the Court.

## COUNT VIII
### Assault and Battery
### Plaintiff v. Defendant Officers

239.    Plaintiff incorporates by reference each allegation stated in the preceding paragraphs.

240.    Defendant Officers assaulted and battered Plaintiff as stated hereinbefore.

241.    Defendant Officers intended to cause Plaintiff severe fear of imminent bodily harm or death and succeeded in doing so by causing the Plaintiff to fear for his life and his personal safety.

242.    As a result of Defendant Officers' assault and battery, Plaintiff suffered the damages stated herein.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages, and any other damages as deemed appropriate by the Court.

### COUNT IX
### Intentional Infliction of Emotional Distress
### Plaintiff v. Defendant Officers

243.    Plaintiff incorporates by reference each allegation stated in the preceding paragraphs.

244.    Defendant Officers acted with extreme and outrageous conduct against Plaintiff to intentionally or recklessly cause him severe emotional distress.

245.    As a result of the actions taken by Defendant Officers, Plaintiff suffered from severe emotional distress, as identified *supra*.

246.    Defendant Officers acted intending to cause Plaintiff distress or with knowledge that such distress was substantially certain to occur.

247.    As a result of Defendant Officers' actions, Plaintiff suffered the damages stated herein.

**WHEREFORE**, Plaintiff, Oscar Robinson, respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred and Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with attorneys' fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages, and any other damages as deemed appropriate by the Court.

Respectfully Submitted,

**FALKENBACH LAW, LLC**

Date: __6/20/2022__                    __/s/ Danielle S. Burke__

Amber L. Falkenbach, Esq.
Attorney ID No. 306610
Danielle S. Burke, Esq.
Attorney ID No. 316811
110 West Front Street
Media, PA 19063
T: (484) 442-8146
F: (484) 930-0148
amber@falkenbachlaw.com
danielle@falkenbachlaw.com
*Attorney for Plaintiff,*
*Oscar Robinson*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 26th day of August 2022, the foregoing *Amended Complaint* was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record, which service satisfies the requirements of the Federal Rules of Civil Procedure:

Katelyn Mays, Esquire
Assistant City Solicitor
Law Department, Civil Rights Unit
City of Philadelphia
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
Katelyn.mays@phila.gov
*Attorney for City of Philadelphia, Officer Eric Clark, and Lieutenant Peszko*

Aleena Sorathia, Esquire
Ahmad Zaffarese, LLC
One South Broad Street, Suite 1810
Philadelphia, PA 19107
asorathia@azlawllc.com
*Attorney for Officer Ryan Redmond*

**FALKENBACH LAW, LLC**

Date:   8/26/2020                            /s/ Danielle S. Burke
                                             Amber L. Falkenbach, Esq.
                                             Attorney ID No. 306610
                                             Danielle S. Burke, Esq.
                                             Attorney ID No. 316811
                                             110 West Front Street
                                             Media, PA 19063
                                             T: (484) 442-8146
                                             F: (484) 930-0148
                                             amber@falkenbachlaw.com
                                             danielle@falkenbachlaw.com
                                             *Attorney for Plaintiff,*
                                             *Oscar Robinson*