# EXHIBIT A



# PHILADELPHIA POLICE DEPARTMENT          DIRECTIVE 10.2

| Issued Date: 9-18-15 | Effective Date: 9-18-15 | Updated Date: 12-13-21 |
|---|---|---|

**SUBJECT:    USE OF MODERATE/LIMITED FORCE**
**PLEAC 1.3.1, 1.3.4, 1.3.5, 1.3.6(a,b,c), 1.3.7, 1.3.8, 1.5.5, 3.1.21 (e)**

---

## INDEX

| SECTION | TITLE | PAGE NUMBER |
|---|---|---|
| 1 | Purpose | 1 |
| 2 | Policy | 1 |
| 3 | Definitions | 2 |
| 4 | Use of Force | 3 |
|   | Use of Force Decision Chart | 4 |
| 5 | Utilizing Force (General) | 7 |
| 6 | Use of OC Pepper Spray | 9 |
| 7 | Use of Police Baton/ASP | 12 |
| 8 | Use of Other Less Lethal Force | 14 |
| 9 | Use of Force Notification Procedures | 15 |
| 10 | Use of Force Incidents Resulting in Death Or Serious Bodily Injury | 16 |
| 11 | Distribution of the Use of Force Form | 18 |
| 12 | Assault on Police Investigation Procedures | 18 |



**PHILADELPHIA POLICE DEPARTMENT**    **DIRECTIVE 10.2**

| Issued Date: 9-18-15 | Effective Date: 9-18-15 | Updated Date: 12-13-21 |
|---|---|---|

**SUBJECT:    USE OF MODERATE/LIMITED FORCE**
**(PLEAC 1.3.1, 1.3.4, 1.3.5, 1.3.6(a,b,c), 1.3.7, 1.3.8, 1.5.5, 3.1.21e)**

---

## 1.    PURPOSE

A.    This directive outlines the proper use of force, particularly in situations involving the use of the baton/ASP, Oleoresin Capsicum (OC) Pepper Spray, and other force, which may be used by police, as well as the required reporting of incidents in which officers are called upon to use less than deadly force.  The use of the Conducted Energy Weapon  (CEW) is fully covered in Directive 10.3, "Use of Less Lethal Force - The Conducted Energy Weapon (CEW)." The use of deadly force is fully covered in Directive 10.1 "Use of Force – Involving the Discharge of Firearms."

---

## 2.    POLICY

A.    The primary duty of all police officers is to preserve human life.  Only the amount of force necessary to protect life or to effect an arrest should be used by an officer**.  Excessive force will not be tolerated.**  Officers should exercise all safe and reasonable means of control and containment, using only the minimal amount of force necessary to overcome resistance.  The application of force by a police officer should be guided by principles found in the following "Use of Force Decision Chart," and the provisions of Chapter 5 of the Pennsylvania Crimes Code (18 Pa. C.S.A. §501, et seq), state and federal court decisions, and other statutory provisions. (PLEAC 1.3.1)

B.    Personnel will not unnecessarily or unreasonably endanger themselves and others in applying these guidelines to actual situations.

`    C.    Subjects may be physically or mentally incapable of responding to police commands due to a variety of circumstances including, but not limited to, alcohol or drugs, mental impairment, medical conditions, or language and cultural barriers.  Officers should be mindful of this when making use of force decisions.

D.    Officers are prohibited from carrying a Department issued CEW or OC Spray, off-duty as an alternative weapon.

E. Officers will only carry and/or use weapons approved and authorized by the Department.  The types and specifications of **ALL** Department authorized ASP/Batons, CEWs, OC Spray, and all less lethal weapons is maintained by the Training and Education Services Bureau.

---

## 3.  DEFINITIONS

A. **Objectively Reasonable:**  Is a Fourth Amendment standard whereby an officer's belief that they must protect themselves or others from death or serious bodily injury is compared and weighed against what a reasonable or rational officer would have believed under similar circumstances.  This determination is made by reviewing all relevant facts and circumstances of  each particular case, including, but not limited to, (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

**NOTE:**  Resisting arrest or flight alone would not justify the use of deadly force. While the US Supreme Court identified three (3) factors that should be evaluated in determining whether an officer's use of force was objectively reasonable, this list was not intended to be all inclusive.  The **TOTALITY OF THE CIRCUMSTANCES** that led an officer to believe force was needed is critical.  Other factors such as, whether an individual is violent, the possibility that the individual is armed, and the number of persons with whom an officer must contend with at the time are all relevant factors to consider. **INDIVIDUAL FACTORS** alone, without additional articulable facts may be insufficient to satisfy the objectively reasonable standard.

*1

B. **Resistance:**  Is an act by an individual that opposes an officer's lawful commands. There are two types of resistance.

 1. **Active Resistance:**  Is defined as the use of physical force to defy an officer's lawful arrest or attempt to gain control of a situation that requires police action.

 2. **Passive Resistance:**  Is defying an officer's lawful order without the use of physical force.  Behaviors may  include not moving, going limp, locking of arms or tightening of the body.

C. **Serious Bodily Injury:** is defined as bodily injury which creates a substantial risk of death, causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

---

4.    **USE OF FORCE**

    A.  <u>**GOAL:**</u>    To always attempt to de-escalate and use sound tactics in any situation where force may become necessary.  In the event force becomes unavoidable, **use only the minimal amount of force necessary to overcome an immediate threat or to effectuate an arrest.**

                    The amount of force, the continued use of any force, and the type of police equipment utilized, all depends upon the situation being faced by the officer.  However, once the threat has been overcome, or a subject is secured in custody, it is an officer's responsibility to de-escalate and immediately address any injuries the suspect may have sustained.

    B.  <u>**USE OF FORCE DECISION CHART:**</u>  The following diagram illustrates the amount of force an officer should use based on the suspect's behavior and threat.  It is the suspect's behavior that places the officer and/or others in danger.  The suspect's threat is the primary factor in choosing a force option.  However, the officer should also consider the totality of the circumstances to include, but not limited to, a suspect's altered state due to alcohol or drugs, mental impairment, medical conditions, or the proximity of weapons.

# USE OF FORCE DECISION CHART

**DE-ESCALATION**

**ESCALATION**

**DEADLY FORCE**
Officer Options: Firearm

Offender Behavior: Objectively reasonable belief that there is an immediate threat of death or serious bodily injury

**LESS LETHAL FORCE**
Officer Options: Conducted Energy Weapon (CEW), ASP/Baton
Offender Threat: Physically Aggressive or Assaultive behavior with immediate likelihood of injury to the officer or others

**MODERATE/LIMITED FORCE**
Officer Options: Physical Control Holds, OC Spray
Offender Threat: Resisting and Non-Compliant

**NO FORCE**
(Use of Force Report not required)

Officer Options: Verbal Commands, Officer Presence
Offender Threat: Obedient, Compliant, Non-Aggressive

Use the option that represents the minimal amount of force necessary to reduce the immediate threat.

C. The following are examples of how to interpret the Use of Force Decision Chart. These examples are for illustrative purposes and not intended as an exhaustive list.

1. No force is required or authorized when the offender is compliant non-aggressive and responds to verbal commands. Officers may need to handcuff such offenders but this is not considered use of force. No use of force report is required under these circumstances.

2. Moderate/limited use of force may be required when the offender is non-compliant and is resisting the officer's commands. Such behaviors may include pushing or pulling away, locking arms, or tightening of the body. Force including control holds, and OC Spray is authorized under these circumstances. Verbal aggression by itself does not warrant the use of force.

   **EXCEPTION:** Whenever protestors/demonstrators that are exercising their Constitutional Rights of Free Speech or Assembly and are non-compliant and passively resisting officer's commands, OC Spray **SHALL NOT BE USED** to overcome the resistance. Rather, officers will disengage and contact a supervisor. If necessary, additional officers will be used to overcome the resistance.

3. The use of the Conducted Energy Weapon (CEW) and/or ASP/Baton is authorized when the offender is physically aggressive or assaultive and there is a immediate likelihood that they may injure themselves or others. Such behaviors may include punching, kicking, grabbing, or approaching with a clenched fist.

   **EXCEPTION:** Whenever protestors/demonstrators that are exercising their Constitutional Rights of Free Speech or Assembly and are non-compliant and passively resisting officer's commands, CEW **SHALL NOT BE USED** to overcome the resistance. Rather, officers will disengage and contact a supervisor. If necessary, additional officers will be used to overcome the resistance.

4. Deadly force is authorized when the officer has an objectively reasonable belief that they must protect themselves or another person from the immediate threat of death or serious bodily injury.

\*1
5. An officer may address an offender's immediate threat with any option that is equal to or lower than on the Use of Force Decision Chart . For example, an officer may use their ASP/Baton, OC Spray, or CEW on an offender displaying assaultive behavior with a likelihood of injury to the officer or others. They may not use an CEW on an offender who is only non-compliant.

   **NOTE**: The mere handcuffing of a compliant individual is not considered force.
\*1   A Use of Force Report is **NOT** required under these circumstances.

**DIRECTIVE 10.2 - 5**

D. RENDERING MEDICAL AID – After employing any force, including lethal or less lethal weapons, officers shall render appropriate medical aid and request further medical assistance, when necessary for the suspect and any other injured individuals, as soon as it is safe to do so. Any aid provided shall be documented in the appropriate report. (PLEAC 1.3.5)

\*1       **NOTE**: Consistent with Directive 3.14(2)(A)(1), "Persons suffering from a serious penetrating wound, (e.g., gunshot, stab wound, and similar injuries of the head, neck, chest, abdomen, and groin) shall be transported to the nearest accredited trauma center. Transportation of such cases will not be delayed to await the arrival of Fire Department paramedics."

E. Though many officers may be at the scene of a police incident where force is being used, some officers may not be directly involved in taking police action. As officers, we have an obligation to protect the public and other officers. Therefore, it shall be the duty of every officer present at any scene where force is being applied to either stop or attempt to stop another officer when force is inappropriately used and/or no longer required. Your actions will both protect the officer from civil or criminal liability and the civilian from serious injury.

F. Officers who witness inappropriate or excessive force have a duty to intervene and to report such violations to a supervisor and Internal Affairs.

G. As outlined in Section 9, Use of Force Notification Procedure, Internal Affairs must be informed when:

     1. A person is treated at a hospital (whether admitted or not) or dies while in police custody as the result of actions taken by police.

     2. Any time a person in police custody is treated at a hospital (e.g., prisoner complaining of chest pains or a prisoner assaulted by another prisoner).

     3. Any incident involving the use of force where an injury or a complaint of an injury results.

     4. Whenever a baton/ASP has been used to strike a subject, OC Spray has been used by police, or the CEW has been used, the approximate number of strikes or discharges must be indicated on the Use of Force report.

        **NOTE**: Whenever the trigger on the CEW is pulled, it is recorded in the weapon and must be reported to Internal Affairs. Accidental discharges will be reported to Internal Affairs through the notification screen on the Police Intranet Homepage. A Use of Force report will not be necessary.

        **EXCEPTION:** When a spark test is conducted.

**DIRECTIVE 10.2 - 6**

5.  Whenever a subject is delivered a strike with a hand, fist, foot, or other body appendage or other object.

*1     H.  The Department's Use of Force report will be completed whenever any Departmental personnel uses physical force upon another person.  Use of force includes, but is not limited to, any instance where a firearm is intentionally pointed at an individual, when the baton/ASP has been used to strike an individual, OC Spray was used on an individual, another object was used to strike an individual, a canine dog has bitten or has been used to physically apprehend an individual, or an CEW has been used. (PLEAC 1.3.6c)

I.  Internal Affairs will serve as the Commissioner's designee to review and evaluate all completed Use of Force Reports as well as be responsible for all Use of Force Internal Investigations or Complaints Against Police.  Internal Affairs will prepare an investigative report on allegations of improper or excessive Uses of Force. (PLEAC 1.3.6 a, b, c)  These investigations include, but are not limited to:

1.  Discharge of a firearm.

2.  Any Use of Force that results in, or is alleged to have resulted in, any injury to another person.

3.  Physical force, or is alleged to have used physical force, upon another person.

J.  Determine if a body-worn camera (BWC) captured an incident involving moderate level force.  If so, the BWC shall be taken to the district, uploaded, and stored.

K.  Guidelines set forth in this directive will also pertain to Police Correctional Officers (PCO) when appropriate and whether PCO's are on-duty at the PDU or elsewhere in the course of their official duties. (PLEAC 3.1.21 e and 1.5.5)

## 5.   UTILIZING FORCE (GENERAL)

A.  Officers, when responding to any incident that may require the use of force, **WILL**:

1.  Evaluate the situation.

2.  Notify a supervisor immediately.

3.  Immediately establish control of their firearm.

4.  When feasible and safe, provide some verbal warning to the individual.

5.  Illuminate the subject, when possible.

**DIRECTIVE 10.2 - 7**

B.  Officers responding to any incident that may require the use of force, **WILL NOT**:

\*1      1.  Except as necessary to prevent serious bodily injury to an officer or member of the public, sit, kneel, or stand on a subject's head, face, neck, chest or back.

2.  Offensively kick and/or stomp on a subject.

**NOTE:**  Kicks are authorized for defensive purposes only.

\*1      3.  Use prohibited neck restraints (i.e., chokeholds, sleeper holds or hogtying).  This will include any incident where an individual attempts to ingest narcotics or other evidence.  Any subject that ingests evidence will be taken immediately to the nearest hospital. (P.L.E.A.C. 1.3.10 f)

4.  Transport an individual in a face down position, especially when handcuffed.  This will serve to prevent positional asphyxia that occurs when the position of the subject's body interferes with their ability to breathe.  If an individual is having trouble breathing or is demonstrating life-threatening symptoms, medical assistance will be sought immediately.

C.  Officers, when force is used **WILL**:

1.  Coordinate appropriate tactics with a sufficient number of personnel to safely overcome any resistance.

2.  Use only the minimal amount of force necessary to overcome resistance.

3.  Except when using a CEW, target the preferred or intermediate striking areas identified in Section 6-B-6.

4.  Handcuff the individual behind the back, palms out, and ensure handcuffs are double-locked, and do so at the earliest possible time to reduce potential resistance.

5.  Ensure that the individual is checked for injuries.

6.  Take any individual who has been struck on the head, complaining of an injury or any case where a CEW or OC Spray was used to the nearest hospital or appropriate trauma center immediately.  Accordingly, an individual who has been placed under arrest and is complaining of an injury, that resulted from police use of force or from other circumstances, will be taken to the nearest hospital.  If the individual refuses treatment, note the name of the hospital and the doctor on the Complaint or Incident report (75-48) and request that the individual sign the 75-48. Note on the 75-48 if the individual refuses to sign.

a. An individual, who is **NOT** placed under arrest but complains of an injury that resulted from police use of force, cannot be forced to receive medical treatment. In these cases, a supervisor will be summoned to the scene and a Complaint or Incident Report (75-48) will be prepared.  The complaining individual will be requested to sign the 75-48, which acknowledges refusal of medical treatment. Note on the 75-48 if the individual refuses to sign.

7. Prepare a Use of Force Report, which will include the description of the actions of the individual which caused the use of force, as well as the actions taken by the officer.  Officers may review footage from only their BWC prior to completing the Use of Force Report if no serious bodily injury or death is likely to occur. .

8. Prepare any other necessary paperwork relating to the incident, as required by Department policy. (PLEAC 1.3.6c)

9. Ensure the investigator assigned is aware that force was used and whether a BWC or other footage is available.

*3

**NOTE**:  A description of the actions of the individual that caused the use of Force, as well as the officer's actions, should be included by the assigned investigator within the Case Report.  Should injuries occur, they should also be described within the Investigation Report to include treatment received.

_____

## 6.    USE OF OC PEPPER SPRAY

A. Oleoresin Capsicum (OC) Spray is an inflammatory agent that causes an intense burning sensation of the skin and mucous membranes.  It has a near immediate effect on an individual sprayed. The effects subside after about 30 minutes.

B. If sprayed in the face, the individual's eyes will close, tear, and swell as a result.  The subject may become disoriented and lose their balance.  When inhaled, the respiratory tract will become inflamed and temporarily restrict breathing to short, shallow breaths. The subject may experience choking, gagging, or gasping for breath.  A burning sensation of the skin may also occur.

C. The use of OC Spray is for defense or to assist in effecting an arrest.  It may be used to:

1. Control an aggressively resisting subject (i.e., an involuntary commitment).

2. Prevent an escape from arrest.

3. Overcome resistance to an arrest.

4. Protect an officer or another person from bodily injury.

    5.    Prevent an individual from injuring themselves.

    6.    Prevent a suicide.

D.   The use of OC Spray is not to be used:

    1.    For the dispersal of non-violent persons.

    2.    For disorderly crowds.

    3.    In situations where people are peacefully exercising their Constitutional Rights of free speech or assembly.

    4.    At random.

    5.    As a threat to gain compliance or information.

E.   Once an individual has been placed under control, there is no further justification for the continued use of the OC Spray.

F.   Uniformed officers <u>will only carry</u> departmentally issued OC Spray on their belt at all times while on duty.

G.   When utilizing OC Spray, officers **<u>WILL</u>**:

    1.    Ensure care is taken to protect infants, children, and the elderly from exposure to the OC Spray.

    2.    Deliver the spray directly into the face (eyes, nose, mouth) and when practical, when in the range of 10-12 feet, in two, one-half second bursts.

    3.    Be aware of cross-contamination, wind direction, and the presence of fellow officers before utilizing spray.

    4.    Safely secure the individual in handcuffs once under control.

    5.    Calm the individual and reassure them that the effects are temporary.

    6.    Expose the subject to fresh air and, if water is available, flush the contaminated areas.

        **NOTE**:  When indoors, ventilate area by opening windows and doors to disperse the OC Contaminant.

    7.    Transport the subject to the nearest hospital and take the spray canister along.

**DIRECTIVE 10.2 - 10**

8. Continue to monitor the subject during transportation for respiratory distress.

9. If the subject is or becomes unconscious, transport as an emergency hospital case.

10. Have subject wash any contaminated areas of the skin with soap and water once arriving at the hospital.

11. When applicable, have subject remove contact lenses and wash effected area.

    **NOTE**: Serious eye damage can occur if contacts are not removed within 4 - 6 hours of exposure.

12. Prepare a 75-48 for the hospital case, and have the individual sign the 75-48 if treatment is refused.  Also, note if the individual refuses to sign.

13. Prepare a Use of Force Report, which will include the description of the actions of the individual which caused the use of force, as well as the actions taken by the officer.

*3

14. Prepare any other necessary paperwork relating to the incident, where necessary (i.e., 75-48).

15. Treat OC Spray as a weapon and store in a secure place when not on duty.

H. Officers, when utilizing OC Spray **WILL NOT**:

1. Spray directly into the eyes at a distance of less than three feet, when possible.

2. Spray into the wind or in a confined area.

3. Keep spray projectors in vehicles.

4. Store where temperatures exceed 120 degrees Fahrenheit.

I. Miscellaneous OC Spray information:

1. All OC Spray will be issued by the Firearms Training Unit (FTU).

2. Officers should check the expiration date on each canister.  If expired, or there is a leak, damage, or the canister is empty, report to the Firearms Training Unit (FTU) for a replacement.  A memorandum will be prepared and distributed as outlined in Section 4 below.

3. Lost or stolen spray canisters shall be immediately reported on memorandum in triplicate to the pertinent district/unit Commanding Officer, fully explaining the circumstances. A 75-48 and the Case Report will be submitted to the pertinent detective division.

*3

4. The memorandum will be distributed as follows:

   a. Commanding Officer, Firearms Training Unit
   b. District/Unit file
   c. Finance Unit

5. When the Commanding Officer determines negligence has occurred, the officer will be subject to disciplinary action and/or required to pay for its replacement.

6. Commanding Officers will review and approve the memorandum and permit the officer to obtain a replacement.

7. Upon an officer's retirement, OC Spray canisters will be turned in to the officer's Commanding Officer and forwarded to the FTU.

---

## 7. USE OF THE POLICE BATON/ASP

A. The use of the baton/ASP is for defense and to assist in effecting an arrest. It should not be used as an offensive weapon. It may be needed to:

1. Block or deflect an attack.

2. Counter-strike in self-defense.

3. Control an aggressively resisting subject.

4. Overcome physically aggressive or assaultive behavior to effect an arrest.

5. Protect an officer or another person from bodily injury.

6. Prevent an individual from injuring themselves.

7. Prevent a suicide.

B. When carrying or utilizing the baton/ASP officers **WILL**:

1. Carry a baton meeting departmental specifications, which shall have an overall length of 22-24 inches and a diameter of one and one-quarter inches (1 1/4"), made of wood or fiberglass or carry a department-issued ASP.

**DIRECTIVE 10.2 - 12**

2.  Carry the baton/ASP whenever leaving the vehicle (uniformed officers and supervisors).

3.  Carry the baton/ASP in your belt loop/holder on the opposite side of the gun holster.

4.  Carry the baton/ASP in a non-aggressive (e.g., under arm) manner during vehicle or pedestrian stops, disturbances, crowds, or other potentially dangerous situations.

5.  Attempt to use alternate forms of control.

6.  Strike only the following locations of the body, when necessary.

    a.  Preferred striking areas:

        1)  Muscle in the legs (thigh and calf) and arms (forearms and biceps). These areas are most vulnerable to an effective strike.

    b.  Intermediate striking areas:

        1)  If striking the preferred areas is not possible, unsafe to the officer or other officers, the officer should attempt to strike the intermediate areas which include the elbows, knees, and ankles. These are secondary strike zones which may cause pain or injury, but are not intended to cause permanent damage.

7.  Immediately notify a supervisor of the use of the baton/ASP.

8.  Take an injured individual or one complaining of an injury to the nearest hospital or appropriate trauma center immediately. Prepare a 75-48 for the hospital case and have the individual sign 75-48 if treatment is refused. Also note if the individual refuses to sign.

9.  Prepare a Use of Force Report in all cases where the baton/ASP was used to strike an individual.

    **NOTE**:    When preparing a Use of Force report after utilizing the baton/ASP, officers will include the approximate number of strikes and the location on the body where the individual was struck. Also, officers will include an explanation when an individual is struck in an intermediate area or unintentionally in the head, face, throat, chest, abdomen, groin and collarbone.

**DIRECTIVE 10.2 - 13**

10. Prepare all other necessary paperwork relating to the incident, when necessary (i.e., 75-48).

*3

C. Officers, when carrying or utilizing the baton/ASP **WILL NOT**:

1. Make modifications of or additions to the baton/ASP.

2. Intentionally strike the head, face, throat, chest, abdomen, groin, spine, and collarbone of an individual.

3. Use more force than is necessary to overcome the resistance.

4. Use another object in place of the baton/ASP, unless unusual circumstances preclude the officer from reaching or using the baton/ASP or OC Spray.  If another object is used, the involved officer will follow the same reporting procedures outlined in this directive and explain why the object was utilized.  The use of other objects may be reasonable and necessary.

D. Lost/Stolen baton/ASP Reporting Procedures*:*

1. Damaged, lost, or stolen baton/ASPs shall be immediately reported on memorandum in triplicate to the pertinent district/unit Commanding Officer, fully explaining the circumstances.

2. When the Commanding Officer determines negligence has occurred, the officer will be subject to disciplinary action and/or required to pay for its replacement.

3. The memorandum will be distributed as follows:

   a. Pertinent Deputy Commissioner
   b. Finance Unit
   c. Retain in district/unit file

---

## 8.   USE OF OTHER LESS LETHAL FORCE (PLEAC 1.3.4, 1.3.8)

A. SWAT Personnel are trained and authorized in using other Less Lethal Force such as:

1. Beanbag Rounds

2. Flashbangs

3. 37 mm Foam Rubber Baton Rounds

4. 37 mm Chemical Agents

    5.   Larger OC Dispersion Devices

    6.   Hand Deployed Chemical Agents (OC)

B.  SWAT personnel will be guided by the policy outlined in this directive, their Unit SOPs, and the direction of the on-scene Incident Commander.

---

## 9.   USE OF FORCE NOTIFICATION PROCEDURE

A.  Whenever less lethal force is used by uniform or plainclothes sworn personnel, the following notification process will be implemented:

*2

    1.   Officers using force will immediately notify Police Radio over air with their badge number and location and a supervisor will be requested to respond to the location of occurrence.

    2.   The supervisor will ensure that only one (1) 75-48 will be prepared describing the circumstances of the incident, as well as information on the use of force required during that incident.  If more than one officer has utilized force during that single incident only one (1) 75-48 is required, though the names of all involved officers must be included.

        a.  The on-scene supervisor will ensure that the Complaint or Incident Report (75-48) will be submitted to the ORS, so the Use of Force Notification message can be sent to Internal Affairs.

        b.  The Use of Force Notification Message (submitted through the Intranet Homepage) must be completed by the ORS before the involved officer(s) completes their tour of duty.

    3.   The supervisor will assign one of the involved officers the responsibility for preparing a complete Use of Force report (75-623).  If more than one officer has used force, they will only complete sections of an additional Use of Force report that pertain to their involvement in the incident, the top line of the report, and the signature block.  The officer may review their BWC footage prior to completing their Use of Force Report if no serious bodily injury or death is likely to occur..

        **NOTE**:  All reports must be completed before the officer(s) completes their tour of duty.

    4.   Both the assigned Lieutenant and the Sergeant will be responsible for reviewing and ensuring completeness and accuracy of the Use of Force report.  They will also sign the form.

**DIRECTIVE 10.2 - 15**

5. When the use of force results in death or serious life threatening injury, the on-scene supervisor will immediately notify Police Radio, their Commanding Officer or Command Inspections Bureau (CIB) commander. Police Radio will make all normal duty hour and non-duty hour, holiday notifications according to their SOP's.

   a. When the use of force results in only minor injury or no injury at all, only the Internal Affairs Notification screen needs to be completed. No phone call to Internal Affairs from a Commander is necessary.

   **NOTE**: If more than one officer is injured or if more than one defendant has had force used against them as a result of a single incident, separate messages must be sent via the Internal Affairs Notification screen.

6. In all cases, the ORS will ensure pertinent information is entered on the district/unit S&R.

---

## 10. USE OF FORCE INCIDENTS RESULTING IN DEATH OR SERIOUS BODILY INJURY (PLEAC 1.3.7)

A. First officer on the scene will be responsible for the following:

   1. Immediately notify Police Radio of the occurrence and provide pertinent information. Request Fire Rescue and a Patrol Supervisor to respond.

   2. Render First Aid.

   3. Ensure the provisions of Directive 4.1, "Responsibilities at Crime Scenes" are followed.

   4. Inform the first Supervisor on the scene of the location(s) of the crime scenes and the general circumstances relative to the preservation and collection of physical evidence. State whether the officer was wearing a body-worn camera (BWC), if so, was it activated during the incident.

B. First Supervisor on the scene will be responsible for the following:

   1. Ensure that Police Radio has been notified of the incident.

   2. Ensure that the provisions of Directive 4.1, "Responsibilities at Crime Scenes" are carried out and protect and secure the crime scene.

   3. Ensure the detainee is transported to the hospital in accordance with Directive 4.13, "Detainees in Hospitals."

4. Determine if any officer at the scene had a BWC and whether it was activated during the incident.

    a. Collect all BWCs with video of the incident.

    b. Ensure the videos are captured and stored as evidence.

*4    c. Following an officer involved shooting, a police discharge, an in-custody death, or a use of force incident likely to result in serious bodily injury or death, **officers shall be prohibited from viewing their BWC footage prior to providing a formal statement to the assigned Internal Affairs Division Investigator**. After providing a formal statement, officers will be permitted to review their BWC footage and provide any supplemental statement to the assigned Internal Affairs Investigator, if they desire.

5. Ensure information concerning the location(s) of the crime scene(s) and the general circumstances relative to the preservation and collection of physical evidence is provided by the involved officer(s) and disseminated to the assigned investigator by remaining at the scene until the arrival of divisional detective(s) for incidents resulting in injury or Homicide detectives for incidents resulting in death.

    a. Ensure any equipment used in a Use of Force incident is seized by the responding Supervisor at the scene.

6. Ensure the 'Use of Force Notification Procedures" in Section 9 of this directive are followed.

C. The involved officer's Commanding Officer or Command Inspections Bureau Commander will:

1. Ensure the Commanding Officer, Internal Affairs is immediately notified.

2. Contact the Police Department's Employee Assistance Program (EAP) within five (5) business days in order to arrange confidential counseling whenever an officer has used force which results in death or serious bodily injury (This will be the responsibility of the involved officer's Commanding Officer).

3. Determine if a BWC was activated and if so, obtain the camera to maintain the footage.

D. Chief Inspector, Office of Professional Responsibility (OPR) will:

1. Determine the assignment status of involved personnel, including the removal from street duty. (PLEAC 1.3.7.)

**DIRECTIVE 10.2 - 17**

2. Return an officer to active street duty as soon as possible after the officer has attended their scheduled visit with the Employee Assistance Program (EAP) has completed the required training at the Range (if applicable); and based on the recommendation of Internal Affairs investigating officer.

3. Officers must be approved for return to active street duty by either the Police Commissioner or the First Deputy Commissioner.

## 11.  DISTRIBUTION OF THE USE OF FORCE FORM

A. When the Use of Force Report(s) (75-623) is completed, copies will be made and distributed as follows:

Original:    Internal Affairs within ten (10) days of the incident, where it will be reviewed and kept for three (3) years.

First copy:    District/Unit Commanding Officer's file, where it will be kept for three (3) years.

Second copy:    Commanding Officer, Firearms Training Unit (OC Pepper Spray/ CEW use only).

## 12.  ASSAULT ON POLICE INVESTIGATION PROCEDURES

A. The purpose of this section is to establish a procedure to follow when conducting an Assault on Police Investigation.

B. In order to ensure the integrity of Assault on Police arrests and to protect all police personnel, the below guidelines will be followed.  Listed below are investigation guidelines and Command oversight for **ALL** Assault on Police Investigations.  They will be in place whether the Assault on Police is the **Primary or Secondary** charge.

C. Supervisor's Responsibilities:

1. A supervisor **WILL** immediately **respond to all Assault on Police/Use of Force Crime Scenes** (whether it is the primary or secondary charge).

   a. As stated in previous investigation guidelines, the responding supervisor will hold or release the crime scene after conferring with a Supervisor from the pertinent investigative unit.

   b. The supervisor will document all Police involved in the assault and/or arrest and supply the names, badge numbers and patrol car numbers to the Detective Division.  The Supervisor will also ensure that all personnel are interviewed by the Detective Division of occurrence.

**DIRECTIVE 10.2 - 18**

    c.   The supervisor will notify the ORS when force has been used by an officer to ensure that the Use of Force Notification Message is sent to Internal Affairs before the end of the involved officer's tour of duty.

    d.   The supervisor will ensure that all civilian witnesses are documented on the Complaint or Incident Report (75-48) (include all contact information, cell phone numbers, etc.) and will be supplied to the Detective Division. Transportation to the Detective Division (for interviews) will also be arranged as needed.

    e.   The supervisor will observe and document (and supply the information to the Detective Division) all injuries to Police and/or defendants (and ensure that they receive hospital treatment).

    f.   Any body-worn camera (BWC) that captures a Use of Force incident, will be recovered and taken back to the district to be uploaded and stored.

    g.   The supervisor will ensure that all Use of Force paperwork is prepared and submitted in accordance with this Directive.

D.  ORS Responsibilities:

   1.   The ORS will send the Use of Force Notification Message to Internal Affairs before the end of the involved officer's tour of duty when force was used by the officer to overcome an immediate threat or to effect an arrest.

E.  Detective Unit Supervisor's Responsibilities:

   1.   A Detective Unit Supervisor **WILL** be notified immediately whenever an Assault on Police (Use of Force) arrest or investigation is received (whether it is the primary or secondary charge).  The Supervisor **WILL**:

    a.   Confer with the responding Supervisor on the street and determine if the crime scene will be held for processing.

    b.   Monitor the investigation, ensuring that all parties (Police and Civilian) are interviewed by Detectives.  Review the interviews and ensure that any follow-up questions are addressed.

    c.   Ensure that all injuries (Police and Civilian) are documented and photographed.

    d.   Ensure any BWC or other video footage is properly viewed, uploaded, stored and documented.

**DIRECTIVE 10.2 - 19**

e. Ensure that all interviews and evidence (photographs, property receipts, etc.) are entered in the Premier One Records Management System (P1RMS). As stated in previous guidelines, ALL Preliminary Discovery is required to be entered in the P1RMS on any arrest before charges are approved by DACU.

\*3

2. **BEFORE** the arrest is entered in PARS, the Detective Supervisor **WILL** notify the Detective Division Commanding Officer (during business hours) so that they can review all paperwork involving the arrest. The Detective Division Commanding Officer will also review all paperwork on an investigation of an Assault on Police (no arrest) **PRIOR** to the Detective submitting an Affidavit for an Arrest Warrant.

3. If the arrest occurred during non-business hours, the Detective Supervisor **WILL** notify Police Radio for a Command Inspections Bureau Commander to respond and review the arrest paperwork (**PRIOR** to entry in PARS).

4. If during business hours, the Detective Division Commanding Officer is unavailable (vacation, etc.), then the Detective Division Supervisor will notify the following in the listed order:

   a. The Divisional Inspector.

   b. The available Patrol Commanding Officer located in the Divisional Headquarters (in the same building as the Detective Division).

   c. A District Commanding Officer in the Division of occurrence (NOT located in the Divisional Headquarters).

5. The Detective Supervisor WILL confer with the responding Commander on the aspects of the case. DACU will be contacted by phone if guidance is needed in the charging procedure.

6. The Detective Supervisor will then ensure that the PARS report is submitted (and approved by the Supervisor) with the proper charges lodged. The Supervisor will ensure that any requested follow-up by DACU is completed immediately and re-submitted for the approval of the PARS.

F. The Assigned Detective **WILL**:

   1. Ensure their Supervisor has been notified of the Assault on Police arrest or investigation (primary or secondary charge).

   2. Ensure all investigative steps have been taken, including (but not limited to), crime scene processing, retrieval of available video, CCI information and/or radio tapes, etc.

**DIRECTIVE 10.2 - 20**

3. Document and photograph all injuries (Police and Defendants).

4. Ensure all persons (Police and Civilian) involved are interviewed. Make interviews available to Supervisory and Command personnel for their review.

5. Attempt to interview the defendant(s) (after advising their Miranda Warnings).

*3

6. Ensure the complete investigative package is available for review by the Supervisor and Command personnel and entered into the P1RMS.

7. Ensure PARS is submitted **ONLY AFTER** the case has been approved by the Unit Supervisor and the reviewing Commander.

G. Responding Commanding Officer Responsibilities:

1. Upon notification of an Assault on Police arrest, the assigned Commander (Detective Captain, Divisional Inspector, District Captain or CIB Commander) will:

   a. Review all arrest and case file paperwork (including interviews).

   b. Confer with Detective Supervisor (and DACU if needed) for proper charges. If **NO** charges are warranted, ensure the suspect(s) are released and the investigative paperwork is updated.

   c. The responding Commanding Officer WILL ensure that an entry is made on the Detective Division Daily S&R listing the rank, name, badge number, and assignment of officer(s) involved and review the Assault on Police arrest (list location of assault, DC# and Detective Control#).

   d. Ensure that the required Use of Force reports are completed, submitted and Internal Affairs is notified, when required.

_____

**RELATED PROCEDURES:**

| | | |
|---|---|---|
| | Directive 3.14, | Hospital Cases |
| | Directive 4.10, | Foot Pursuits |
| | Directive 4.13, | Detainees in Hospitals |
| | Directive 6.15, | Employee Assistance Program (EAP) |
| | Directive 7.16, | Department Directives Program |
| | Directive 10.1, | Use of Force – Involving the Discharge of Firearms |
| | Directive 10.3, | Use of Less Lethal Force: The Conducted Energy Weapon (CEW) |
| | Directive 10.4, | Use of Force Review Board (UFRB) |
| | Directive 10.7, | Crisis Response/Critical Incident Negotiations |

| | |
|---|---|
| Directive 10.9, | Severely Mentally Disabled Persons |
| Directive 10.10, | Off-Duty Police Actions |
| Directive 12.14, | Injuries on Duty & Other Service Connected Disabilities |

---

## BY COMMAND OF THE POLICE COMMISSIONER

---

**PLEAC** – Conforms to the standards according to the Pennsylvania Law Enforcement Accreditation Commission.

---

| FOOTNOTE | GENERAL# | DATE SENT | REMARKS |
|---|---|---|---|
| *1 | 7462 | 09-01-20 | Addition/Changes |
| *2 | 1732 | 10-13-20 | Change |
| *3 | 0985 | 12-13-21 | NIBRS/P1RMS |
| *4 | 0990 | 12-13-21 | Change |



# PHILADELPHIA POLICE DEPARTMENT          DIRECTIVE 10.1

| Issued Date: 9-18-15 | Effective Date: 9-18-15 | Updated Date: 01-30-17 |
|---|---|---|

**SUBJECT:   USE OF FORCE – INVOLVING THE DISCHARGE OF FIREARMS (PLEAC – 1.3.2, 1.3.3, 1.3.5, 1.3.6, 1.3.7)**

---

## INDEX

| SECTION | TITLE | PAGE NUMBER |
|---|---|---|
| 1 | Policy | 1 |
| 2 | Definitions | 2 |
| 3 | Use of Force | 3 |
| | Use of Force Decision Chart | 4 |
| 4 | Specific Prohibitions | 6 |
| 5 | Reporting Discharges of Firearms | 7 |
| 6 | Investigation of Police Discharges | 13 |
| 7 | Custody and Disposition of Firearms Discharged by Police Personnel | 15 |
| 8 | Discharge Involving Animals | 17 |
| 9 | Release of Information Regarding Officer Involved Shootings (OIS) | 19 |
| 10 | Annual Review | 21 |
| | Supervisors Firearms Discharge Checklist | 22 |
| | Officer Involved Shooting (OIS) Safeguard Protocol Memorandum (Example) | 23 |

 **PHILADELPHIA POLICE DEPARTMENT**      **DIRECTIVE 10.1**

| Issued Date: 9-18-15 | Effective Date: 9-18-15 | Updated Date: 01-30-17 |
| --- | --- | --- |

**SUBJECT:   USE OF FORCE – INVOLVING THE DISCHARGE OF FIREARMS (PLEAC – 1.3.2, 1.3.3, 1.3.5, 1.3.6, 1.3.7)**

---

## 1.    POLICY

A.  It is the policy of the Philadelphia Police Department, that officers hold the highest regard for the sanctity of human life, dignity, and liberty of all persons.  The application of deadly force is a measure to be employed only in the most **<u>extreme circumstances</u>** and all lesser means of force have failed or could not be reasonably employed.

B.  The most serious act in which a police officer can engage during the course of their official duties is the use of deadly force.  The authority to carry and use firearms in the course of public service is an immense power, which comes with great responsibility.

C.  Police Officers shall not use deadly force against another person, unless they have an objectively reasonable belief that they must protect themselves or another person from death or serious bodily injury.  Further, an officer is not justified in using deadly force at any point in time when there is no longer an objectively reasonable belief that the suspect is dangerous, even if deadly force would have been justified at an earlier point in time.  (PLEAC 1.3.2)

D.  When feasible under the circumstances, police officers will give the suspect a verbal warning before using deadly force.

E.  Police officers using their professional judgment should not discharge their weapon when doing so might unnecessarily endanger innocent people.

F.  Subjects may be physically or mentally incapable of responding to police commands due to a variety of circumstances including but not limited to alcohol or drugs, mental impairment, medical conditions, or language and cultural barriers.  Officers should be mindful of this when making use of force decisions.

G.  After using deadly force, officers shall immediately render the appropriate medical aid and request further medical assistance for the suspect and any other injured individuals when necessary and safe to do so and will not be delayed to await the arrival of medical assistance.  (PLEAC 1.3.5)

H.  Officers who witness inappropriate or excessive force have a duty to report such violations to a supervisor and Internal Affairs.

---

## 2.  DEFINITIONS

A.  **<u>Objectively Reasonable</u>**:  Is a Fourth Amendment standard whereby an officer's belief that they must protect themselves or others from death or serious bodily injury is compared and weighed against what a reasonable or rational officer would have believed under similar circumstances.  This determination is made by reviewing all relevant facts and circumstances of each particular case, including, but not limited to, (1) the severity of the crime at issue, (2) whether the suspects poses an immediate threat to the safety of the officers or others, (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

**NOTE**:  Resisting arrest or flight alone would not justify the use of deadly force.  While the US Supreme Court identified three (3) factors that should be evaluated in determining whether an officer's use of force was objectively reasonable, this list was not intended to be all inclusive.  The **<u>TOTALITY OF THE CIRCUMSTANCES</u>** that led an officer to believe force was needed is critical.  Other factors such as, whether an individual is violent, the possibility that the individual is armed, and the number of persons with whom an officer must contend with at the time are all relevant factors to consider.  **<u>INDIVIDUAL FACTORS</u>** alone would not give a reasonable officer the belief that deadly force is necessary.

B.  **<u>Resistance:</u>**  Is an act by an individual that opposes an officer's lawful commands.  There are two types of resistance.

1.  **<u>Active Resistance:</u>**  Is defined as the use of physical force to defy an officer's lawful arrest or attempt to gain control of a situation that requires police action.

**DIRECTIVE 10.1 - 2**

2. **Passive Resistance:** Is defying an officer's lawful order without the use of physical force. Behaviors may include not moving, going limp, locking of arms or tightening of the body.

C. **Serious Bodily Injury:** is defined as bodily injury which creates a substantial risk of death, causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

---

## 3.  USE OF FORCE

A. **GOAL:**   To always attempt to de-escalate any situation where force may become necessary. In the event force becomes unavoidable, **to use only the minimal amount of force necessary to overcome an immediate threat or to effectuate an arrest.**

The amount of force, the continued use of any force, and the type of police equipment utilized, all depends upon the situation being faced by the officer. However, once the threat has been overcome, or a subject is secured in custody; it is an officer's responsibility to de-escalate and immediately address any injuries the suspect may have sustained.

B. **USE OF FORCE DECISION CHART:**   The following diagram illustrates the amount of force an officer should use based on the suspect's behavior and threat. It is the suspect's behavior that places the officer and/or others in danger. The suspect's threat is the primary factor in choosing a force option. However, the officer should also consider the totality of the circumstances to include, but not limited to, a suspect's altered state due to alcohol or drugs, mental impairment, medical conditions, or the proximity of weapons.

**DIRECTIVE 10.1 - 3**



USE OF FORCE DECISION CHART

**DEADLY FORCE**
Officer Options: Firearm

Offender Behavior: Objectively reasonable belief that there is an immediate threat of death or serious bodily injury

**LESS LETHAL FORCE**
Officer Options: Electronic Control Weapon (ECW), ASP/Baton
Offender Threat: Physically Aggressive or Assaultive behavior with immediate likelihood of injury to self or others

**MODERATE/LIMITED FORCE**
Officer Options: Physical Control Holds, OC Spray
Offender Threat: Resisting and Non-Compliant

**NO FORCE**
(Use of Force Report not required)

Officer Options: Verbal Commands, Officer Presence
Offender Threat: Obedient, Compliant, Non-Aggressive

DE-ESCALATION

ESCALATION

Use the option that represents the minimal amount of force necessary to reduce the immediate threat.

C.  The following are examples of how to interpret the Use of Force Decision Chart. These examples are for illustrative purposes and not intended as an exhaustive list.

1.  No force is required or authorized when the offender is compliant non-aggressive and responds to verbal commands.  Officers may need to handcuff such offenders but this is not considered use of force.  No use of force report is required under these circumstances.

2.  Moderate/limited use of force may be required when the offender is non-compliant and is resisting the officer's commands.  Such behaviors may include pushing or pulling away, locking arms, or tightening of the body.  Force including control holds, and OC Spray is authorized under these circumstances. Verbal aggression by itself does not warrant the use of force.

    **EXCEPTION:**  Protestors/Demonstrators that are exercising their Constitutional Rights of Free Speech or Assembly and are non-compliant and passively resisting officer's commands, OC Spray **SHALL NOT BE USED** to overcome the resistance.  Rather, officers will disengage and contact a supervisor.  If necessary, additional officers will be used to overcome the resistance.

3.  The use of the Electronic Control Weapon (ECW) and/or ASP/Baton is authorized when the offender is physically aggressive or assaultive and there is a immediate likelihood that they may injure themselves or others.  Such behaviors may include punching, kicking, grabbing, or approaching with a clenched fist.

    **EXCEPTION:**  Protestors/Demonstrators that are exercising their Constitutional Rights of Free Speech or Assembly and are non-compliant and passively resisting officer's commands, ECW **SHALL NOT BE USED** to overcome the resistance.  Rather, officers will disengage and contact a supervisor.  If necessary, additional officers will be used to overcome the resistance.

4.  Deadly force is authorized when the officer has objectively reasonable belief that they must protect themselves or another person from the immediate threat of death or serious bodily injury.

5.  An officer may address an offender's immediate threat with any option to the level of threat or lower.  For example, an officer may use their ASP/Baton, OC Spray, or ECW on an offender displaying assaultive behavior with a likelihood of injury to themselves or others.  They cannot use an ECW on an offender who is only non-compliant.

    **NOTE**:  The mere handcuffing of a compliant individual is not considered force.

**DIRECTIVE 10.1 - 5**

**4.    SPECIFIC PROHIBITIONS**

A.  Police officers shall not draw their firearms unless they reasonably believe an immediate threat for serious bodily injury or death to themselves or another person exists.

B.  Police officers shall not discharge their firearms in defense of property.

C.  Police officers shall not use a firearm as a club.

D.  Police officers shall not fire warning shots under any circumstances.  (PLEAC 1.3.3)

E.  Police officers shall ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive, or improper actions.  It is often a tactically superior police procedure to withdraw, take cover or reposition, rather than the immediate use of force.

F.  Police officers shall not discharge their firearms to subdue a fleeing individual who presents no immediate threat of death or serious physical injury to themselves or another person.

G.  Police officers shall not discharge their firearms **FROM** a moving vehicle unless the officers are being fired upon.  Shooting accurately from a moving vehicle is extremely difficult and therefore, unlikely to successfully stop a threat of another person.

H.  Police officers shall not discharge their firearms **AT** a vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle (e.g., officers or civilians are being fired upon by the occupants of the vehicle).

  1.  A moving vehicle alone shall not presumptively constitute a threat that justifies an officer's use of deadly force.

  2.  Officers shall not move into or remain in the path of a moving vehicle.  Moving into or remaining in the path of a moving vehicle, whether deliberate or inadvertent, **SHALL NOT** be justification for discharging a firearm at the vehicle or any of its occupants.  An officer in the path of an approaching vehicle shall attempt to move to a position of safety rather than discharging a firearm at the vehicle or any of the occupants of the vehicle.

      **NOTE**:  An officer should never place themselves or another person in jeopardy in an attempt to stop a vehicle.

3.  The prohibitions regarding the discharge of a firearm at or from a moving vehicle exist for the following reasons:

    a.  To avoid unnecessarily endangering innocent persons, both when inside the vehicle and in the vicinity.

    b.  Bullets fired at a moving vehicle are extremely unlikely to disable or stop the vehicle.

    c.  Disabling the driver of a moving vehicle creates unpredictable circumstances that may cause the vehicle to crash and injure other officers or innocent bystanders.

    d.  Moving to cover in order to gain and maintain a superior tactical advantage maximizes officer and public safety while minimizing the need for deadly or potentially deadly force.

    **NOTE**:  Barring exigent circumstances, (e.g., the driver is unconscious and the motor is still running), an officer shall never reach into an occupied vehicle in an attempt to shut off the engine or to recover evidence, since this has been known to result in serious injury to officers.

I.  Police officers with revolvers shall not under any circumstances cock a firearm. Firearms must be fired double-action at all times.

---

## 5.   REPORTING DISCHARGES OF FIREARMS

A.  The discharge of any firearm, whether accidental or intentional, by sworn personnel on duty or off duty (except test or target fire at a bona fide pistol range or lawfully hunting game) will be reported as follows:

1.  The officer who fired the weapon will:

    a.  Immediately notify Police Radio of the occurrence and provide pertinent information regarding the need for supervisory personnel and emergency equipment if required.

    b.  Inform the first Supervisor on the scene of the location(s) of the crime scene(s) and the general circumstances relative to the preservation and collection of physical evidence.  State whether they were wearing a body-worn camera (BWC) and if so, was it activated during the incident.

2. Each officer at the scene of a discharge of a firearm by any police officer will:

   a. Notify Police Radio of the discharge, unless the officer knows Police Radio has already received such a notification.

   b. Inform the first Supervisor on the scene of the circumstances of the discharge and provide all relevant information concerning the incident.

   c. Ensure the provisions of Directive 4.1, "Responsibilities at Crime Scenes" are followed.

   d. Report to the first supervisor on the scene, whether they had a BWC and if it was on during the incident.

3. Police Radio will:

   a. Ensure that a district Supervisor is dispatched to the scene.

   b. Immediately make the following notifications:

      *2
      1) Officer Involved Shooting Investigation Unit (OISI)
      2) Internal Affairs
      3) Detective Division of Occurrence
      4) District of Occurrence
      5) District or Unit to which officer is assigned
      6) Command Inspection Bureau (CIB), if applicable
      7) Crime Scene Unit (CSU)
      8) RTCC to identify all City owned or privately owned cameras
      9) Police Advisory Commission (PAC) Executive Director

   c. Notify the Commanding Officer, Employee Assistance Program (EAP) of the police discharge. The Commanding Officer, EAP, will have police radio notify the on-call peer counselor and they will contact police radio for details of the shooting.

4. First Supervisor on the scene will be responsible for the following:

   a. Ensure that Police Radio has been notified of the incident.

   b. Ensure that the provisions of Directive 4.1, "Responsibilities at Crime Scenes" are carried out and protect and secure the crime scene.

   c. Determine which officer(s) discharged their weapon(s) by examining the magazine/cylinder of the weapon of each officer present during the discharge.

**DIRECTIVE 10.1 - 8**

    d.  Ensure any officer having left the scene prior to the Supervisor's arrival will be recalled in order to have their weapon inspected.

    e.  Determine if any officer at the scene had a BWC and whether it was on during the incident.

        1)  Collect all BWCs with video of the incident.

        2)  Ensure the videos are captured and stored as evidence.

*2        3)  The involved officer may review only their BWC video prior to making any official statements to Internal Affairs or OISI Unit.

*2    f.  Prepare the Supervisor's Firearm Discharge Checklist (75-654) and remain at the scene with the involved officer/s until the arrival of the OISI Unit and IAD personnel.  The involved officer/s will conduct a walk-through of the scene with  the following personnel:

        1)  OISI Supervisor and Investigator
        2)  IAD Personnel
        3)  CSU Personnel
        4)  First Supervisor
        5)  FOP Representative/Attorney

        **NOTE:**  No other personnel will be present for the walk-thru unless authorized by the OISI Unit Supervisor.  If multiple officers discharge a firearm, a walk-through will be conducted with each officer individually.

    g.  The supervisor will take possession of the evidence bag containing the
*2      officers weapon and transport the weapon to the OISI Unit.

        1)  Glock (semi-automatic) weapon inspection:

        Instruct the officer(s) to remove the magazine for inspection and note the number of rounds.  If the weapon has been fired, record the number of remaining rounds and take possession of the magazine.  Supervisors, who are not Glock-trained, are prohibited from physically handling the weapon (excluding the magazine) during the inspection.

2)  Revolver inspection:

Pay special attention to the cylinder position before ordering the officer to open their weapon's cylinder.  Note the condition of each round in all chambers and what chamber was located under the firing pin when the cylinder was opened.  If the weapon has been fired, take note of the number of spent cartridges and take possession of all six rounds of ammunition, live or spent.

3)  Patrol Shotgun inspection:

In a situation where a police officer has discharged a patrol shotgun, a patrol supervisor will remove the remaining rounds from the magazine, open the action to make the weapon safe and make a note of the remaining rounds.  Supervisors, who are not Patrol Shotgun/Patrol Rifle trained, are prohibited from physically handling the weapon (excluding the magazine) during the inspection.

4)  Patrol Rifle inspection:

In a situation where a police officer has discharged a patrol rifle, a patrol supervisor will remove the magazine, make the weapon safe, remove the remaining rounds from the magazine and make a note of the remaining rounds.  Supervisors, who are not Patrol Shotgun/Patrol Rifle trained, are prohibited from physically handling the weapon (excluding the magazine) during the inspection.

NOTE:  In the event the responding patrol supervisor is not trained to handle the patrol shotgun/rifle, a trained supervisor from an adjoining district or a SWAT supervisor will be requested to respond to the location.

h.  Ensure information concerning the location(s) of the crime scene(s) and the general circumstances relative to the preservation and collection of physical evidence is provided by the involved officer(s) and disseminated to the assigned investigator by remaining at the scene until the arrival of OISI Unit personnel. The first supervisor on the scene will use the Supervisors Firearm Discharge Checklist (a copy is attached at the end of this directive) to determine required information.

*2

NOTE:  The Supervisors Firearms Discharge Checklist card will be carried by all patrol supervisors.

*2

    i.  Will escort the involved officer, if not incapacitated, directly to the OISI Unit. When reasonable, discharging officers should be transported separately. If additional vehicles are needed; additional supervisors will be summoned to provide transportation.

        **NOTE:** The first Supervisor on the scene (Corporal, Sergeant, or Lieutenant) will not delegate the responsibility of transporting officers to any other supervisor regardless of the district/unit assignment of the officer(s) involved. However, command-level personnel (Captain or above) may assign a subordinate Supervisor to transport involved officers in the event a commander is the first superior officer on the scene.

    j.  Will brief the PAC Executive Director or designee on all the known facts of the discharge.

    k.  Ensure they follow the replacement weapon protocol in Section 5-B.

        **NOTE:** The responding PAC observer **<u>WILL NOT</u>** be given access to the crime scene.

  5.  The Operations Room Supervisor (ORS) of the district of occurrence will:

    a.  Make notification via a computer terminal to Internal Affairs by accessing the Use of Force Notification Screen on the PPD Intranet homepage. (PLEAC 1.3.6)

B.  Replacement weapon protocol for Officer Involved Shootings (OIS).

  1.  This protocol will only be used when an officer discharges at a person, whether or not the person is struck, or in cases where the suspect may have handled the weapon (i.e., in a struggle for the weapon) resulting in touch DNA evidence.

  2.  The first supervisor on the scene will ensure Police Radio notifies the SWAT Unit assigned to the ROC Division where the discharge occurred. SWAT personnel will immediately respond to the location of occurrence to issue a replacement weapon, a paper evidence bag and protective gloves.

  3.  The officer who fired the weapon will remove the magazine, un-chamber the round and make the weapon safe by locking the slide to the rear. If the weapon is a revolver, the weapon will be unloaded and made safe. The firearm will be placed in the paper evidence bag, sealed, and the label will be filled out completely and turned over to the supervisor.

**DIRECTIVE 10.1 - 11**

    a. To preserve the integrity of DNA evidence, latex or non-latex, gloves will be worn when securing, rendering safe and packaging the weapon in the paper evidence bag.

   4. The first supervisor on the scene will ensure that the paper evidence bag, with the label filled out completely and accurately, is delivered to the OISI Unit.

\*2

     **NOTE:** All officers and supervisors should carry personal protection equipment (PPE) (i.e., latex or vinyl gloves) which are available at the Police Warehouse located at 660 East Erie Avenue.

   5. SWAT Units assigned to each ROC Division will carry replacement weapons (8-10 firearms) comprised of 9MM, 40, 45, and 38 calibers. The weapons will be carried on all tours and accounted for daily.

   6. In the event that SWAT is unavailable (i.e., training, barricade) the ORS at SWAT Headquarters will retrieve a replacement weapon from the vault and have it immediately delivered to the location of occurrence along with a paper evidence bag and protective gloves.

    a. Personnel assigned to the SWAT Operations Room will ensure they monitor "J" Band on all tours.

C. Reporting Discharges of Firearms OUTSIDE Jurisdiction

   1. The officer who fired the weapon will:

    a. Call the local Emergency 9-1-1 to notify the jurisdiction of occurrence.

    b. Comply with the directions given by the local investigating law enforcement officials.

    c. Call the Philadelphia Police Radio Room at (215) XXX-XXXX so the proper notifications can be made.

   2. Police Radio will:

    a. Notify Command Inspection Bureau (CIB) or district/unit Commanding Officer depending on the time of occurrence.

    b. Notify Internal Affairs and provide pertinent information regarding the discharge.

**DIRECTIVE 10.1 - 12**

3. Internal Affairs will:

    a. Be immediately notified of any incident involving the discharge of a firearm by police. The Internal Affairs Shooting Team, will be notified of any incident involving the discharge of a firearm by Philadelphia Police personnel. In addition, the Shooting Team will be notified whenever a city issued or privately owned weapon of a Philadelphia Police Officer is discharged, intentionally or accidentally, by someone other than the respective officer.

    b. Notify the local investigative agency, speak to the assigned investigator, and request if Internal Affairs can respond to the scene or meet with the investigator.

    c. Respond to any discharge within reasonable driving distance (2-3 hours).

    d. If permissible, obtain any documents and/or interviews pertaining to the discharge.

D. Research and Analysis Unit will:

1. Report all crime through the online Pennsylvania Uniform Crime Reporting System as specified by the Federal Bureau of Investigation (FBI).

---

## 6. INVESTIGATION OF POLICE DISCHARGES

*2    A. The OISI Unit will:

1. Investigate all cases involving the discharge of firearms by law enforcement personnel occurring within the confines of Philadelphia.

2. In OIS incidents resulting in a fatality, ensure that all pertinent death notifications have been made.

3. Ensure that any video that captured the incident is obtained, stored and processed as evidence.

4. Be responsible for the preparation of the Investigation Report (75-49) which will be forwarded to Internal Affairs within seven (7) calendar days. (PLEAC 1.3.6)

B. Crime Scene Unit personnel will:

1. Process the scene after conferring with the assigned investigator.

C.  The Discharging Officer's Commanding Officer will:

*2        1.  Ensure the Commanding Officer, OISI Unit is notified.

2.  Contact the Police Department's Employee Assistance Program (EAP), within five (5) business days, in order to arrange confidential counseling whenever an officer has discharged their firearm, except at an animal.

> **NOTE:** Commanding Officers may use their discretion regarding required EAP counseling when the discharge is at an animal.

3.  Be responsible for having the officer retrained at the Firearms Training Unit (FTU) before returning to duty (Exception: discharges at deer.)

4.  Whether or not the discharge results in death or injury to any person, the officer shall be temporarily assigned to non-street duties.  (PLEAC 1.3.7)

*2        > **EXCEPTION:** Officers who discharge at deer will be returned to duty immediately after arrival of OISI Unit personnel.  OISI Unit personnel will not respond to the scene when SWAT has killed a deer or other wild animal, except canines.

5.  An officer will return to active street duty as soon as possible after the officer has attended their scheduled visit with Employee Assistance Program (EAP), completed their required training at the FTU and based on the recommendation of Internal Affairs.

> **NOTE:** Officers must be approved for return to active street duty by either the Police Commissioner or the First Deputy Commissioner.

D.  Commanding Officer, Employee Assistance Program (EAP) will:

*2        1.  Have the assigned peer counselor respond to the OISI Unit to meet the discharging officer for an initial assessment.  During the initial assessment, the peer counselor will explain the emotions that the officer might be experiencing and explain the procedures that will occur following their discharge (i.e. reporting to the FTU and EAP.).

> **NOTE**: EAP peer counselors will only respond to police discharges where the suspect was fatally wounded or injured as a result of the discharge.  The exception is when there is a request from the investigating shooting team, the officer's Commanding Officer, CIB or the Commanding Officer, EAP.

2.  Have the peer counselor conduct a confidential follow-up assessment and provide referral information to the officer.  The officer will be encouraged to contact Penn Behavioral Health (PBH).

**DIRECTIVE 10.1 - 14**

3. Have the peer counselor, upon the completion of the session with EAP or the Penn Behavioral Health provided counselor; fax a memorandum to the Commanding Officer, OISI Unit stating the officer has attended their appointment with EAP. All other information is prohibited from being released. All EAP sessions are **STRICTLY CONFIDENTIAL** and information pertaining to the   session cannot be released without the officer's permission.

\*2

NOTE: EAP is a support service and is not involved in the investigation of the police shooting.

E. Internal Affairs will:

1. Ensure a member of the IAD Shooting Team interviews the officer(s) that discharged their weapon, separately, within seventy-two hours of the incident.

\*2

\*2    2. Prepare a memorandum to the Police Commissioner detailing the results of the Internal Affairs investigation. (PLEAC 1.3.6)

\*2    NOTE: Upon completion of the memorandum, the Chief Inspector, Office of Professional Responsibility, will forward a complete report to the Deputy Commissioner, Office of Professional Responsibility, who will forward it to the Police Commissioner.

3. Notify the Commanding Officer of the discharging officer's status.

---

## 7.    CUSTODY AND DISPOSITION OF ALL FIREARMS DISCHARGED BY POLICE PERSONNEL

\*2    A. The OISI Unit will prepare a Property Receipt (75-3) containing the following information: the firearm's make, model, caliber, and serial number. A second 75-3 will be prepared for the fired cartridge(s) and unfired ammunition. The OISI Unit case number will be indicated on both Property Receipts.

B. In discharges of firearms not resulting in injury and in any discharge (accidental or intentional) resulting in the shooting of an animal, the discharged firearm (including patrol shotguns and/or patrol rifles) will be given to the transporting supervisor in accordance with the following guidelines:

NOTE: When transporting a patrol shotgun and/or patrol rifle, prior to leaving the scene, the transporting supervisor will secure the patrol shotgun and/or patrol rifle in the vehicle lock box after making the weapon safe.

*2       1.  When the firearm will be returned, the assigned OISI Unit personnel will designate, in the description section of the Property Receipt containing the firearm information, "**FIREARM IS TO BE TEST FIRED AND RETURNED**."  The assigned OISI Unit personnel's signature and date will follow.  The OISI Unit will retain the white (control) copy of the Property Receipt for their records.

       2.  The transporting supervisor will transport the firearm, fired cartridge(s), and unfired ammunition and both Property Receipts directly to the Firearms Identification Unit (FIU).

         a.  When the Firearms Identification Unit (FIU), 843 North 8th Street, Room 022 is open, FIU will test fire and make every effort to expedite the examination and return the weapon to the involved officer.  The test shots and firearm related materials (bullets, specimens, and/or fired cartridge cases) will be retained at FIU.

            **NOTE:**  Evidence Intake Unit is open 24 hours a day, weekends, and holidays.

         b.  When FIU is closed, the Evidence Receiving Clerk - Laboratory Division will aid the officer in securing their firearm in the mobile firearm's storage box.  A replacement firearm of the same caliber will immediately be issued to that officer.  Subsequently, the FIU will contact the officer for return of their original firearm.

         c.  The firearm will be unloaded and made safe, but not cleaned prior to examination.

*2         d.  Upon completion of the FIU examination, a copy of the findings will be forwarded to the OISI Unit.

C.  In all deliberate shootings (not involving animals) where an injury or death occurs
*2    and all accidental discharges of firearms resulting in injury or death, OISI Unit will:

       1.  Determine if the firearm can be returned to the officer.

       2.  If the firearm is to be returned to the officer, follow the procedure in Section 7-B-1 and 2 in this directive, except the actual transportation of the weapon to
*2         FIU will be done by the OISI Unit.

*2       3.  If the firearm is not to be returned, the assigned OISI Unit personnel will designate in the description section of the Property Receipt containing the firearm information one of the following:

         a.  FIREARM IS TO BE TEST FIRED AND RETAINED—ISSUE A REPLACEMENT WEAPON.

**DIRECTIVE 10.1 - 16**

       b.  FIREARM IS TO BE TEST FIRED AND RETAINED—<u>DO NOT</u> ISSUE REPLACEMENT WEAPON.

*2     4.  The assigned OISI Unit investigator's signature and date will follow.  The OISI Unit will retain the white (control) copy of any Property Receipt.

*2     5.  The assigned OISI Unit personnel will transport the firearm, fired cartridge(s), and unfired ammunition, and both Property Receipts directly to the Firearms Identification Unit (FIU).

       a.  When the Firearms Identification Unit (FIU) is open, the FIU clerk will take possession of the weapon and other material.

*2        b.  When FIU is closed, the Evidence Receiving Clerk, Laboratory Division, will aid the OISI Unit personnel in properly securing the weapon and related material in the mobile firearm's storage box.

*2        c.  If a replacement firearm is to be issued, the involved officer, upon leaving the OISI Unit, will proceed to FIU or Evidence Receiving Clerk-Laboratory Division.

*2     6.  FIU will test fire the firearm in question, forward a copy of the findings to the OISI Unit and the pertinent Detective Division.

D.  City or Privately Owned Firearms

    1.  Internal Affairs will determine the disposition of the City-owned firearm and notify FIU to transport the discharged firearm to the Firearms Training Unit.  All other evidence, including fired cartridge(s) and unfired ammunition will be stored at FIU until released by Internal Affairs.

    2.  During the second week of January, a status review of City-owned firearms being retained under the above conditions will be conducted by the Commanding Officer, Firearms Training Unit.  Internal Affairs will determine which weapons may be returned to inventory.  The Commanding Officer, Firearms Training Unit will submit a final report to the Deputy Commissioner, Organizational Services, by February 28th of each year, detailing the status of all firearms being retained.

## 8.  DISCHARGES INVOLVING ANIMALS

A.  Destroying Injured Deer

    1.  Firearms should not be used to destroy injured deer when they are not presenting an immediate threat to the officer or another person.  Attempt to contact the Pennsylvania Game Commission at (610) XXX-XXXX or (610) XXX-XXXX.

**DIRECTIVE 10.1 - 17**

2. If the above agency is unavailable, and the severities of the injuries are such that the animal should be destroyed for humane reasons, officers will first request the assistance of the SWAT Unit, who will be responsible for its destruction.

3. SWAT personnel will:

   a. Upon destroying an animal, be responsible for completing the preformatted memorandum and a 75-48.

   *2    b. The memorandum and 75-48 will be submitted to the OISI Unit and Internal Affairs within 24 hours of the incident.

   c. If the SWAT Unit is unavailable, the officer may destroy the deer, but only in the presence and on the orders of a Supervisor.

      **NOTE:** Usually one shot between the eyes or behind the ear of the animal should be sufficient to complete the task.  However, in the event it becomes necessary for police personnel to destroy any animal suspected of being rabid by use of a firearm, it is preferred that the animal be shot in the body rather than the head.  The head needs to be examined by the Philadelphia Department of Public Health.

*2    4. Police Radio will notify the OISI Unit and the Internal Affairs Shooting Team.  The discharging officer and the on-scene Supervisor will remain on the scene until their arrival.  (Exception: When SWAT personnel have performed the task.)

5. Consideration should be given before discharging a weapon to destroy any animal (i.e., the close proximity of people and buildings, the type of back stop or ground).

6. The Streets Department will be notified, via Police Radio, to remove the carcass of deer or other animals found or destroyed by police personnel.  Suspected rabid animals that are shot by police will be transported by Animal Care and Control Team (ACCT).  Dogs that are shot by police will be transported by ACCT or to ACCT by police personnel.  They will not be transferred to any veterinary hospital or private veterinarian even if, the animal is still alive.

B. Discharges Involving Other Animals

1. Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat, or when acting consistently with existing Department guidelines authorizing the humane destruction of deer.

**DIRECTIVE 10.1 - 18**

    a.   When on location with an injured animal which is not presenting an immediate threat to the officer or another person, every attempt should be made to confine or contain the animal and notify Police Radio to have them contact the Animal Care and Control Team (ACCT).

  2.  In all cases where a dog is shot and injured by the police, the animal will be transported directly to ACCT for examination by a veterinarian.

    **NOTE**: Police personnel will not transport an injured dog shot by police to a veterinary hospital unless exigent circumstances exist and upon approval of a supervisor (ex. ACCT or SPCA is unavailable).

---

## 9.   RELEASE OF INFORMATION REGARDING OFFICER INVOLVED SHOOTINGS (OIS)

1*     A.  A press conference will be held by the Police Commissioner or designee within 72 hours of an officer involved shooting in which an individual was killed or wounded. An official press statement will be released by the Police Commissioner or designee within 72 hours of an incident when an on duty accidental discharge occurs or when an individual was shot at but not struck as a result of a weapons discharge by a member of the Department.  The information will include the officer's name, years of service, assignment and duty status.

*1        **NOTE:**  The office of Public Affairs will issue a press release when a domestic animal is killed by an officer.  In animal shootings the name of the officer will not be released.

  1.  The officer(s) will be placed on Administrative Duty Status pending the outcome of the investigation.

  2.  The release will contain a preliminary summary stating the circumstances of the incident known at the time and based on the facts collected and confirmed by the investigators.  The release will provide a brief synopsis of the incident, condition (injuries) of the individual, charges (if applicable), and the proceeding steps of the investigation.  Names of the individual suspect or the officer will be released unless there are public safety concerns.

  3.  A preliminary summary based on the facts collected and confirmed by the investigators will be placed on the Philadelphia Police Department's website in the OIS (Officer Involved Shooting) section of the site.

  4.  The summary on the Department's website may be updated based on the Department's further investigation of the incident.

B.  The First Deputy will ensure the following steps are followed:

*2
1.  Ensure the OISI Unit provides the involved officer with a Safeguard Protocol memorandum when the officer makes their official statement.

*2
2.  Ensure that the OISI Unit notifies the Deputy Commissioner, Patrol Operations, Criminal Intelligence, Police Radio and Public Affairs when the Safeguard Protocol is activated.

C.  The Commanding Officer, Criminal Intelligence in conjunction with DVIC Social Media Investigative Support Team (SMIST), will perform a threat assessment on the OIS within seventy two (72) hours prior to disclosure of the officer's identity and prepare a report.

1.  The results of the threat assessment report will be forwarded to the First Deputy Commissioner Field Operations or his designee, who will review the threat assessment report with the involved officer and their Commanding Officer.

2.  Field Operations will offer to provide a security detail at the officer's residence, longer if needed, following the release of information in reference to the Officer Involved Shooting.  If the officer(s) lives outside the city, patrol will work with the affected jurisdiction to provide coverage or provide the coverage necessary if the outside jurisdiction is unable to do so.  The final decision to implement a security detail will be left to the officer's discretion.

a.  If the involved officer resides within the boundaries of Philadelphia, the detail will be assigned to the district where the officer resides.

b.  If the involved officer resides outside the boundaries of Philadelphia, the detail will be assigned to the officers district/unit of assignment if the outside jurisdiction is unable to provide coverage.

c.  If any conflict arises as a result of detail assignments, the First Deputy will have the final decision on how to provide the manpower for the security detail.

3.  Police Radio will enter the officer's home address into CAD and give Priority 1 status to calls for help coming from that location.

4.  If the officer lives outside the boundaries of Philadelphia, Field Operations will make a request to the appropriate jurisdiction to enter the officer's home address into their CAD and respond accordingly to calls for help coming from that location.

**DIRECTIVE 10.1 - 20**

D. Commanding Officer, Criminal Intelligence in conjunction with the DVIC Social Media Investigative Support Team (SMIST) will contact the involved member and discuss ways they can review their social media footprint to minimize the amount of personal information posted on-line and discuss the steps they can take, if needed, to protect themselves against identity theft.

E. A copy of the Officer Involved Shooting (OIS) Safeguard Protocol memorandum is attached at the end of this directive.

## 10. ANNUAL REVIEW

*2  A. Research and Planning in conjunction with Internal Affairs, the OISI Unit and the Training and Education Services Bureau shall review this directive annually and recommend any updates and changes through the appropriate chain of command to the Police Commissioner.

| **RELATED PROCEDURES:** | | |
|---|---|---|
| | Directive 3.14, | Hospital Cases |
| | Directive 3.20, | Animal Control |
| | Directive 4.1, | Responsibilities at Crime Scenes |
| | Directive 4.10, | Foot Pursuits |
| | Directive 4.16, | Media Relations and the Release of Information to the Public |
| | Directive 6.15 | Employee Assistance Program (EAP) |
| | Directive 10.2, | Use of Force/Less Lethal Force |
| | Directive 10.3, | Use of the Electronic Control Weapon (ECW) |
| | Directive 10.4, | Use of Force Review Board (UFRB) |
| | Directive 10.6, | Firearms Policy: On or Off Duty |
| | Directive 10.7, | Critical Response/Critical Incident Negotiations |
| | Directive 10.9, | Severely Mentally Disabled Persons |
| | Directive 10.10, | Off Duty Police Actions |
| | Directive 12.14, | Injuries on Duty and Other Service Connected Disabilities |

## BY COMMAND OF THE POLICE COMMISSIONER

**PLEAC** – Conforms to the standards according to the Pennsylvania Law Enforcement Accreditation Commission

| **FOOTNOTE** | **GENERAL #** | **DATE SENT** | **REMARKS** |
|---|---|---|---|
| *1 | 6201 | 07-12-16 | Addition/Change |
| *2 | 8427 | 01-30-17 | Addition/Changes |

**DIRECTIVE 10.1 - 21**

## SUPERVISOR'S FIREARM DISCHARGE CHECKLIST

1. Did you discharge your firearm?

    a)  If so, in what direction?
    b)  Approximately, where were you located when you fired?
    c)  How many shots do you think you fired?
    d)  Approximately, where was the suspect at when you fired?

2. Is anyone injured?

    a)  If so, where are they located?

3. Are there any outstanding suspects?

    a)  If so, what is their description?
    b)  What direction and mode of travel?
    c)  How long have they been gone?
    d)  What crime(s) have they committed?
    e)  What type of weapon do they have?

4. Is it possible the suspect fired rounds at you?

    a)  If so, what direction were the rounds fired from?
    b)  How many shots do you think the suspect fired?
    c)  Approximately, where was the suspect located when they fired?

5. Do you know if any other officer(s) discharged their firearms?

    a)  If so, who are they?
    b)  Approximately, where was the officer(s) located when they fired?

6. Are there any weapons or evidence that needs to be secured/protected?

    a)  If so, where are they located?

7. Are you aware of any witnesses?

    a)  If so, where are they located?

8. Were you wearing a body-worn camera?

    a)  If so, was the camera on during the incident?

**DIRECTIVE 10.1 - 22**

**POLICE**

*MEMORANDUM*

CITY OF PHILADELPHIA
DATE:

**TO**    :

**FROM**    :    Police Commissioner

**SUBJECT:**    <u>OFFICER INVOLVED SHOOTING (OIS) SAFEGUARD PROTOCOL</u>

1.  A member of the Internal Affairs Shooting Team will review the information contained within this memorandum with the Officer(s) involved in the shooting. This will ensure the Officer(s) understand that a press conference and/or official press release will be released by the Police Commissioner or his designee within 72 hours of an officer involved shooting. The information will include the officer's name, years of service, assignment and duty status.

2.  The Commanding Officer, Criminal Intelligence in conjunction with DVIC Social Media Investigative Support Team (SMIST), will perform a threat assessment on the OIS within seventy two (72) hours prior to disclosure of the Officer's identity and prepare a report.

3.  The results of the threat assessment report will be forwarded to the First Deputy Commissioner Field Operations or his designee, who will review the threat assessment report with the involved Officer and their Commanding Officer.

4.  A security detail will be provided at the Officer's residence following the release of information in reference to the Officer Involved Shooting according to Directive 10.1 "Use of Force- Involving the Discharge of Firearms". The final decision to implement a security detail will be left to the involved Officer's discretion.

5.  Police Radio will enter the Officer's home address into CAD and will give Priority One (1) status to any call for help coming from that location.

6.  If the Officer lives outside the boundaries of Philadelphia, Field Operations will make a request to the appropriate jurisdiction to enter the Officer's home address into their CAD and respond accordingly to calls for help coming from that location.

7.  Criminal Intelligence in conjunction with DVIC Social Media Investigative Support Team (SMIST), will discuss ways that the involved Officer(s) and their family members can review their social media footprint to minimize the amount of personal information posted on-line. In addition, Criminal Intelligence in conjunction with DVIC SMIST, will educate the involved Officer(s) on the necessary steps they can take to protect themselves against identity theft if needed.

_____
Police Commissioner
Philadelphia Police Department

**DIRECTIVE 10.1 - 23**